THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERVEN WALLS, Defendant-Appellant.

First District (1st Division)   No. 1—99—0065

Opinion filed June 11, 2001.

Jean-Baptiste & Raoul, of Evanston (Kwame Raoul, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Linda D. Woloshin, and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Defendant Erven Walls was convicted in a jury trial of armed robbery, armed violence, aggravated kidnaping, and aggravated battery. He was sentenced to 50 years' imprisonment. On appeal, defendant raises four issues. He contends that: (1) he was denied due process because the State failed to tender material prior to trial relating to the victim's immigration status and any pending investigations by Immigration and Naturalization Services; (2) defendant's trial counsel was ineffective for failing to uncover the victim's immigration file prior to trial; (3) the trial court erred in sentencing defendant to consecutive sentences because section 5—8—4(a) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a) (West 1998)) is unconstitutional; and (4) he was improperly sentenced on the charge of armed violence. For the reasons that follow, we affirm defendant's conviction and remand for resentencing.

## BACKGROUND

In May 1997 when Yinka Jinadu arrived at his estranged wife Delores' apartment he was hit over the head with a baseball bat, stripped of his clothing and tied up with an electrical cord. At trial, Jinadu testified that he came to the United States in 1994, worked for a car dealership and eventually started his own trucking company. He met and married Delores in 1995 and they separated in 1996. In April 1997, Delores began to work as Jinadu's secretary. On May 10, 1997, Delores did not arrive at work as scheduled and Jinadu paged her. After calling him, Delores explained that her car was broken and asked that Jinadu come to pick her up at her apartment. Jinadu drove to

Delores' apartment and arrived at 10:15 a.m. Delores invited Jinadu up to the apartment to wait while she finished getting ready. As Jinadu walked through the threshold of the door he was hit on the head with a baseball bat and lost consciousness.

The evidence at trial showed that, when Jinadu awoke, he saw his wife and three or four other men in the room. A man stood nearby with a baseball bat in one hand, a gun in the other hand and a scarf covering the lower portion of his face. Jinadu also saw defendant, Erven Walls, with a gun in his hand. Jinadu had met defendant on two prior occasions and knew him to be his wife's boyfriend.

The man with the baseball bat walked over to Jinadu, told him to keep his eyes closed and hit him on the head again with an iron object. Defendant then walked over to Jinadu and hit him repeatedly on the head and around the eyes. Defendant and the man with the bat then pulled Jinadu into the bathroom, handcuffed him and placed him in the bathtub. Both men demanded to know where Jinadu kept his car and money. One of the men, codefendant Tony Hillard, came to the bathroom with a pillow and a gun. He began to place the pillow on Jinadu's face but the man with the bat stopped Hillard and told him that they should wait. Five hours elapsed during which time Jinadu was threatened by the various offenders to tell the men where all his money was kept. Eventually, codefendant Hillard placed a towel over Jinadu and turned on the faucet in the tub. The men then turned the light off and left.

Around 7 p.m. Jinadu extricated himself from the electrical tape binding his feet and climbed out of the tub. He was unable, however, to release the handcuffs binding his hands. He opened the bathroom door and saw that he was alone in the apartment. He walked out of the apartment and onto the street where he saw the man with the baseball bat and codefendant Hillard standing across the street. Upon seeing him, both men fled down the street.

Prior to trial, defendant requested and the State provided him with information regarding Jinadu's background. The State indicated that Jinadu had no criminal history and that it was unaware of any pending investigations against him. Defendant filed a motion to suppress his statements which the court denied and the case proceeded to trial.

Officer Ramirez testified that he was on patrol on May 10, 1997, when he was stopped by a young boy who directed him to Jinadu. At the time Jinadu was on the street and had an open head wound, gray duct tape on his mouth and chin and his hands were bound in handcuffs. Jinadu showed Officer Ramirez Delores' apartment. As Officer Ramirez entered the apartment he saw hundreds of plastic bags,

a scale, white powder, spoons and breathing masks. Officer Ramirez also saw that there was blood in the bathtub. From the apartment he recovered two loaded revolvers and documents of identification for defendant, Zachary T. Walls, Jerome Walls, Germaine Craine and Delores Jinadu.

Officer Schmidt testified that while Officer Ramirez was in the apartment, he waited with Jinadu outside of the apartment. He stated that Jinadu identified Delores by name but was unable to name any of the other offenders. Detective Bradley testified that he was assigned to follow up on the case. After talking to Jinadu, Detective Bradley had the names of Delores, defendant and Germaine Craine. Jinadu told the detective that the offenders wanted money and drugs. On September 17, 1997, Detective Bradley arrested defendant and Delores at 1121 South State Street. Walls was placed in a lineup and was identified by Jinadu as one of the offenders. Detective Bradley also learned that one of the recovered guns was registered to Laretha Hillard. After speaking to Laretha Hillard, Detective Bradely arrested codefendant Tony Hillard, who was later placed in a lineup and identified by Jinadu as one of the offenders.

Assistant State's Attorney Michael O'Malley testified that he interviewed defendant at the police station. Defendant told him that his uncle planned to rob Jinadu and threatened defendant if he did not help. For his cooperation in the plan to rob Jinadu, defendant was rewarded with 10 grams of heroin. The plan consisted of having Delores call Jinadu to come over to her apartment at which time someone would hit him over the head. Defendant further stated that after Jinadu arrived at Delores' apartment, he and Delores left and she dropped him off at his sister's home.

Defendant presented stipulated testimony from Janet Lupa, a court reporter, who recorded Jinadu's statement before the grand jury. Jinadu's testimony at trial varied at times from the recording of his testimony before the grand jury. Jinadu stated that as he arrived at Delores' house, he saw three of the offenders in front of the building. Following deliberations, the jury found defendant not guilty of attempted murder and guilty of aggravated kidnaping, armed robbery, aggravated battery, and armed violence.

Following the trial defendant filed a motion for a new trial. Based on Jinadu's victim impact statement, defendant believed that an ongoing investigation was in effect with Immigration and Naturalization Services (INS) regarding Jinadu's involvement in the present case. Jinadu had stated in the victim impact statement that, "[b]ecause of this incident, I am not able to visit my family in Africa due to INS." Defense counsel further stated that he had filed a motion for discovery

requesting any reports relating to any INS investigations regarding Jinadu's involvement in the present case but that the State had failed to tender any information in relation to any investigations that INS was conducting prior to trial. The State responded that it had conducted an exhaustive investigation and that it found no information involving any type of state, local or federal investigation regarding Jinadu. Defense counsel requested additional time to inquire with INS as to any investigations it may have involving Jinadu. Defense counsel requested that the State provide him with the names of people it contacted at INS. Prior to the next court date the State tendered the INS file number and the name of the investigator it spoke to at INS.

At the next court date, defense counsel stated that he had spoken to a supervisor at INS who informed him that Jinadu's INS file was closed. The trial court then allowed defense counsel to question Jinadu regarding his immigration status. Jinadu stated that during the trial he wanted to visit his father in Africa but that immigration officials told him that he must remain in the United States for the duration of the trial. Jinadu further stated that he filed an application for permanent residency but that he became a citizen upon his marriage to Delores. Jinadu produced a laminated card from INS for employment authorization. Thereafter, the trial court denied defendant's motion for a new trial.

Defendant then filed a motion for reconsideration. Defense counsel informed the court that, two days after the denial of the motion for a new trial, he spoke to a representative from the United States Attorney's office who informed him that Jinadu was an illegal alien. Defense counsel argued in his petition that in March 1998 the spousal petition for permanent residency which Delores had filed on behalf of Jinadu had been withdrawn, thereby making Jinadu an illegal alien subject to deportation. Defense counsel argued that Jinadu's impact statement was inaccurate in that he stated that he was unable to leave the country because of his involvement in this case whereas in actuality Jinadu was unable to leave the country due to his residency status. Defense counsel further stated that he had indicated to the State that he had questions regarding Jinadu's immigration status and had inquired whether there were any investigations concerning Jinadu but that the State had inaccurately assured defense counsel that there were no such investigations pending. In light of Jinadu's untruthfulness regarding his immigration status, defense counsel urged the trial court to reconsider defendant's motion for a new trial and motion to reduce defendant's sentence. Following arguments from both sides, the trial court denied both motions. This appeal followed.

## ANALYSIS

### I. Discovery Violation

Defendant first argues that the State committed a discovery violation by failing to tender information regarding the victim's immigration status and any pending investigations against him. Defendant maintains that the prosecution's failure to disclose this favorable and material evidence denied him due process and a fair trial and sentencing hearing in violation of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). *People v. Sims*, 167 Ill. 2d 483 (1995).

●1 In *Brady*, the United States Supreme Court set forth the government's affirmative duty to disclose evidence that is favorable to the defendant. The Court established that where evidence is material either to guilt or to punishment, regardless of the good faith or bad faith of the prosecution, the suppression of such evidence favorable to an accused upon request violates due process. *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. In making its materiality determination, a court should consider the cumulative effect of all suppressed evidence favorable to the defense, rather than consider each piece individually. *People v. Hobley*, 182 Ill. 2d 404, 433 (1998). Though the judgment of the trial court in these matters is given great weight, a reviewing court will find an abuse of discretion when a defendant is prejudiced by the discovery violation and the trial court fails to eliminate the prejudice. *People v. Matthews*, 299 Ill. App. 3d 914, 918 (1998), citing *People v. Weaver*, 92 Ill. 2d 545, 559 (1982).

●2 Initially, we must address the State's claim that defendant has waived this issue on appeal. The State correctly observes that defendant's written posttrial motion framed the issue in terms of the court's failure to permit cross-examination of the victim regarding his immigration status rather than specifically alleging that the State committed a *Brady* violation in not tendering such material to the defense. The well-settled general rules are that issues not raised both during trial and in a posttrial motion are effectively waived for purposes of review. *People v. Enoch*, 122 Ill. 2d 176 (1988). Moreover, our supreme court has held that having specified the ground for his objection at trial, a defendant waives any alternative objections not specified. *People v. Steidl*, 142 Ill. 2d 204 (1991). As such, defendant's argument on appeal has been waived as he did not raise this issue in his posttrial motion or during arguments.

Despite waiver, however, defendant's argument would not succeed on the merits. Contrary to defendant's argument, the evidence in question in this case is not such that it created a reasonable probability that, had the evidence been disclosed to the defense, the result

of the proceeding would have been different. Before trial, defense counsel requested any and all reports or documents related to Jinadu that the State's Attorney's office had access to, including but not limited to those of any law enforcement agency or multijurisdictional units. The State responded that it had no knowledge that any of the potential witnesses had criminal convictions or investigations pending against them. During trial, defense counsel cross-examined Jinadu as to his immigration status. Defense counsel asked Jinadu whether he was seeking to become an American citizen to which Jinadu answered yes. Defense counsel then asked him whether there was a pending investigation with INS regarding his immigration status. The State objected and the trial court sustained this objection on the grounds of relevance.

During the posttrial proceedings, defendant's counsel sought additional time to ascertain whether there were any pending investigations against Jinadu based on Jinadu's victim impact statement. In the victim impact statement, Jinadu stated, "because of this incident I am not able to visit my family in Africa due to INS." Defense counsel requested that the State should "look into this matter to see if there is such material that [was] discoverable." The State responded, "[We] inquired of INS, if he was the focus of any investigation whatsoever and found no information at all. *** We were told there were none." Defense counsel then requested that the State provide him with the names and numbers of the people the State contacted at INS regarding the victim. Prior to the next court date, the State provided defense counsel with a file number and the name of an investigator. At the next court date, defense counsel informed the trial court that he had spoken to a supervisor at INS who indicated that a spousal petition application had been filed on behalf of Jinadu by his wife, Delores. The supervisor also reported that the petition was withdrawn and the file was deemed closed. He further indicated that Jinadu "may be an illegal alien" as a result of the withdrawal of the petition.

Based on this information, defense counsel sought another continuance and requested that he be able to subpoena an INS district director in order to obtain the closed file. The State objected, arguing that such information was not only collateral but also irrelevant to any issues presented at trial. The State indicated, "[E]ven if he is an illegal alien, that has nothing to do with the fact that he can't be victimized by the acts of this defendant and his partners." The trial judge denied defense counsel's motion for another continuance, stating that he had granted four defense continuances since the motion for a new trial was filed. However, the trial judge allowed defense counsel to cross-examine Jinadu as to his immigration status. Jinadu explained that

his wife filed a petition for citizenship on his behalf and he produced an INS employment authorization card, which he showed to defense counsel.

When asked to explain his comment in the victim impact statement, Jinadu replied:

> "What it exactly means is during that time that I decided to visit my father, this case was on, and immigration officer tried to alert me to understand that they need me in court by the time I'm visiting my family in Africa. She asked me not to leave."

Defense counsel asked Jinadu to clarify whether the INS officer asked Jinadu not to leave the country as a result of his involvement in the criminal case or because of the petition for citizenship which was pending before the INS. Jinadu replied, "Talking about this Judge Toomin case." Defense counsel asked Jinadu which officer he spoke to at INS. The State objected and the trial court sustained the objection stating, "I heard about enough of this. I've heard about enough."

The trial court ended any further questions by defense counsel stating:

> "As far as I'm concerned, when Mr. Jinadu indicated that he didn't have to apply to anything because he had married a U.S. citizen, that struck about as responsive and resonant chord as I could imagine. *** Could he have still been married to her even though she's in prison for trying to kill him? He's still married to her. He showed you a card which shows that he's here legally until next April. He was here legally when this case was called for trial. He's here legally now, and your [sic] just, you're wasting a lot of time."

The trial court denied defendant's motion for a new trial and the matter then proceeded to sentencing. Following sentencing, defendant filed a motion for reconsideration. Defense counsel argued that the information presented by the State before the jury was designed to make Jinadu appear like an innocent victim; a victim that had no criminal history or any drug connections. Moreover, the image perpetuated by the State was that of a hard-working immigrant who was representative of the "American Dream" by coming to the United States, starting a successful business and marrying an American woman. This image, however, according to defense counsel, was inaccurate in light of Jinadu's illegal alien status. Defendant argued that Delores' actions in withdrawing the spousal petition seeking permanent residency changed Jinadu's immigration status and prejudiced him both against her and her boyfriend, defendant. The trial court denied defendant's motion for reconsideration.

To establish a violation of the discovery rule, suppressed evidence must be both favorable to the accused and material. *People v. Hobley,*

182 Ill. 2d 404, 432 (1998). If the omitted evidence creates a reasonable doubt that did not otherwise exist, a constitutional error occurred. *United States v. Agurs*, 427 U.S. 97, 112, 49 L. Ed. 2d 342, 355, 96 S. Ct. 2392, 2402 (1976); *People v. Diaz*, 297 Ill. App. 3d 362, 370 (1998). In cases subsequent to *Brady*, the Supreme Court delineated the standard for determining whether undisclosed evidence is "material." Under *Brady* and its progeny, favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985); *Sims*, 167 Ill. 2d at 507. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *People v. Alduino*, 260 Ill. App. 3d 665 (1994). When the reliability of a given witness may well be determinative of guilt or innocence, the nondisclosure of evidence affecting credibility falls within the general *Brady* rule. *Giglio v. United States*, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 108, 92 S. Ct. 763, 766 (1972).

The *Brady* disclosure requirement has been codified in Illinois in Supreme Court Rule 412 (134 Ill. 2d R. 412). Rule 412 provides, in relevant part:

"(c) Except as is otherwise provided in these rules as to protective orders, the State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor." 134 Ill. 2d R. 412(c).

The prosecution's duty to disclose under this rule is a continuing one, requiring prompt notification to the defendant of the discovery of any additional material or information, up to and during trial. 134 Ill. 2d R. 415(b); *People v. Watson*, 76 Ill. App. 3d 931, 935-36 (1979). Among the factors to be considered in determining whether a new trial is warranted are the closeness of the evidence, the strength of the undisclosed evidence, and the likelihood that prior notice would have helped defendant discredit the evidence. *Alduino*, 260 Ill. App. 3d at 670.

We note that the information which defendant argues should have been tendered to him at the outset of the trial basically consists of the INS file number and the name of the investigator handling Jinadu's case file. This is the only information that the State had in its possession. The question that must be answered at this juncture is whether this information was material for purposes of a *Brady* violation. As the State repeatedly indicated, and the record demonstrates, the State did not have any further information, documents or paperwork to ten-

der to defendant in relation to Jinadu's immigration status. Based on the State's inquiry of INS, there were no pending investigations relating to Jinadu. Defense counsel himself stated that he did not believe that the State was deliberately withholding information from the defense. Defendant's argument on appeal is that the State should have researched the issue further. Contrary to defendant's argument, however, the State exercised due diligence in investigating and reporting the information provided to it by INS.

Moreover, even after defense counsel further investigated the matter himself, he was unable to provide any additional information to the trial court. Essentially, the only information provided was the speculation that Jinadu "may be an illegal alien." The trial court granted defense counsel a number of continuances in order to investigate his allegation that Jinadu was an illegal alien and that there was a pending investigation against him. However, the fruits of defense counsel's search consisted only of information relating to the withdrawal of the spousal petition and that Jinadu's legal immigration status "may have expired" with the withdrawal of the petition. The trial court further allowed defense counsel to recall Jinadu prior to sentencing and further question him as to his immigration status. Again, no additional or material information was learned. To the contrary, Jinadu provided defense counsel with an employment card issued by INS corroborating his immigration status. Significantly, the trial court, after repeatedly asking defense counsel to explain the relevance of Jinadu's immigration status, explicitly ruled that such evidence was not relevant in the context of this case. Based on this record and the totality of the circumstances, we conclude that the evidence which defense counsel sought was not material in the present situation as it would not have reasonably altered the outcome of the trial.

The appropriate inquiry is not whether the evidence might have helped the defense, but whether it is reasonably likely that it would have affected the outcome of the case. *Sims*, 167 Ill. 2d at 507. In other words, the question is whether, in the absence of the undisclosed evidence, defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Strickler v. Greene*, 527 U.S. 263, 289-90, 144 L. Ed. 2d 286, 307, 119 S. Ct. 1936, 1952 (1999). Here, the evidence of Jinadu's immigration status, even if it were shown that he was indeed an illegal alien, does not satisfy the threshold requirement of materiality under a *Brady* analysis. Further, it would not have affected the outcome of the trial had defense counsel had this information in his possession at the beginning of the trial. It is reasonably probable that the outcome of neither the trial nor the sentencing

hearing would have been different had defendant had additional information regarding Jinadu's immigration status. We further do not believe this evidence, even if it were available, could reasonably have put the entire case in such a different light so as to undermine defendant's conviction. As such, the State committed no *Brady* violation.

## II. Ineffective Assistance of Counsel

•3 Defendant next contends that he was denied effective assistance of counsel where his attorney failed to uncover Jinadu's INS file prior to trial. As we have resolved the *Brady* issue and found that the information defendant sought was not material and did not prejudice defendant, it is unnecessary to resolve the additional issue of ineffective assistance of counsel for failing to subpoena such information prior to trial. The court need not determine whether defense counsel's performance was deficient before examining whether defendant was sufficiently prejudiced by the alleged deficiencies. *People v. Clemons*, 277 Ill. App. 3d 911, 921 (1996). Here, since the evidence was not material to defendant's guilt of the crime charged, it did not prejudice the defendant and was not outcome determinative. See *People v. Goldsmith*, 259 Ill. App. 3d 878 (1994).

## III. *Apprendi* Issue

•4 Relying on the Supreme Court case *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2363 (2000), the defendant contends section 5—8—4(a) is unconstitutional and, therefore, the trial court erred in imposing consecutive sentences under this section after finding the defendant caused severe bodily injury to the victim. In *Apprendi*, the Supreme Court held unconstitutional a New Jersey statute that allowed the trial judge to impose an extended-term sentence where the trial judge found by a preponderance of the evidence that the defendant acted with a racially biased motive in committing the offense. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455-56, 120 S. Ct. at 2363. The Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The *Apprendi* Court concluded that it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363. In this case the trial judge sentenced defendant under section 5—8—4(a) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a) (West 1998)),

which calls for the imposition of consecutive sentences in cases of multiple convictions arising out of a single course of conduct if one of the offenses is either a Class 1 or Class X felony and the court finds that the defendant inflicted severe bodily injury. Section 5—8—4(a) states in pertinent part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury ***." 730 ILCS 5/5—8—4(a) (West 1998).

Recently, our supreme court found in *People v. Wagener* that *Apprendi* concerns are not implicated by consecutive sentencing. *People v. Wagener*, 196 Ill. 2d 269, 286 (2000). The *Wagener* court reasoned that because consecutive sentences remain discrete and do not transmute into a single sentence, they cannot run afoul of *Apprendi*, which only addresses sentences for individual crimes. *Wagener*, 196 Ill. 2d at 286. Accordingly, the *Wagener* court determined that section 5—8—4(b), which allows the imposition of consecutive sentences where the sentencing court is of the opinion that such a term is necessary to protect the public from further criminal conduct by the defendant, passes constitutional muster. *Wagener*, 196 Ill. 2d at 286. Following the reasoning of *Wagener*, we conclude that section 5—8—4(a), under which defendant was sentenced, is also constitutional. Thus, we affirm the trial court's order imposing consecutive sentences.

## IV. Armed Violence Sentence

•5 Additionally, defendant contends that he was improperly sentenced on the charge of armed violence. Before January 1, 1995, armed violence with a category I weapon was a Class X felony, punishable by a minimum of six years' imprisonment. 730 ILCS 5/5—8—1(a)(3) (West 1994). However, Public Act 88—680 (Pub. Act 88—680, eff. January 1, 1995), commonly known as the Safe Neighborhoods Act, increased the minimum term for armed violence to 15 years' imprisonment. 720 ILCS 5/33A—3(a) (West 1996). In the present case, the trial court sentenced defendant to 25 years' imprisonment on the charge of armed violence under Public Act 88—680. In *People v. Cervantes*, 189 Ill. 2d 80 (1999), the Illinois Supreme Court held that Public Act 88—680 violates the single subject clause of the Illinois Constitution and is unconstitutional. Effective April 13, 2000, while defendant's appeal was pending, Public Act 91—696 (Pub. Act 91—696, eff. April 13, 2000) replaced Public Act 88—680, under which defendant was sentenced with an identical mandatory minimum sentencing provision. The State contends that this reenacted statute should apply retroactively in this case.

Application of the reenacted sentencing provision would violate the *ex post facto* clauses of the Illinois and the United States Constitutions. Ill. Const. 1970, art. I, § 16; U.S. Const., art. I, § 10. The traditional rule is that statutes are presumed to apply prospectively only and will not be given retroactive effect absent clear language within the statute indicating that the legislature intended such effect. *First of America Bank, Rockford v. Netsch*, 166 Ill. 2d 165, 182 (1995). More recently it has been held that the better approach is to apply the law that applies by its terms at the time of the appeal, unless doing so would interfere with a vested right. *People v. Williams*, 301 Ill. App. 3d 210, 214 (1998), citing *First of America Trust Co. v. Armstead*, 171 Ill. 2d 282, 290 (1996). Generally, amendments to statutes are construed to apply prospectively and not retroactively. *People v. Digirolamo*, 179 Ill. 2d 24, 50 (1997).

In this case, nothing in the statute indicates that the legislature intended retroactive application of the reenacted statute. The State notes that Public Act 91—696 would become "effective upon becoming law" and that it was signed into law on April 13, 2000. Thus, the express language of the Act makes it applicable only to offenses that occurred on or after April 13, 2000, and the Act was not intended to apply retroactively. Moreover, contrary to the State's argument, the reenacted statute constitutes a substantive change in the law. Public Act 88—680 created a statutory minimum sentence of 15 years' imprisonment for the offense of armed violence. When our supreme court invalidated Public Act 88—680 in *Cervantes*, the law became void *ab initio*. *Cervantes*, 189 Ill. 2d 80. In other words, it was as if the law never existed. *People v. Gersch*, 135 Ill. 2d 384, 390 (1990); *People v. Tellez-Valencia*, 295 Ill. App. 3d 122, 125 (1998). Accordingly, Public Act 91—696 created a new substantive sentencing law and therefore cannot be applied retroactively.

The State also argues that the reenacted statute applies retroactively to defendant because doing so does not interfere with a vested right. However, the State disregards the fact that the defendant had a right not to be sentenced by the trial court pursuant to a sentencing scheme that legally did not exist. Retroactive application of the reenacted statute would result in the deprivation of defendant's accrued right to a sentence based on the original statute, which mandated a sentencing range from 6 to 30 years' imprisonment. Thus, the reenactment of Public Act 88—680, which was found to be void *ab initio*, was not merely procedural in nature. Rather, it created a new sentencing scheme by increasing the minimum sentencing requirement to 15 years' imprisonment.

In the present case it is unclear from the record whether the trial

court considered the increased minimum of 15 years' imprisonment under Public Act 88—680 when sentencing defendant and whether that minimum had any impact, whatsoever, on the trial court's decision to sentence defendant to 25 years. Therefore, we vacate defendant's sentence on armed violence and remand for sentencing under the statute in effect prior to the enactment of Public Act 88—680 and note according to the terms of that statute a sentencing range from 6 to 30 years' imprisonment was mandated. 730 ILCS 5/5—8—1(a)(3) (West 1994).

For all of the foregoing reasons, we affirm in part, vacate in part and remand for resentencing.

Affirmed in part and vacated in part; cause remanded.

McNULTY, P.J., and TULLY, J., concur.