No. 3-03-0732

Filed August 15, 2006.

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2006

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit Will County, Illinois |
|---|---|---|
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02-CF-2258 |
| WILLIAM J. WILKE, | ) ) | Honorable Richard Schoenstedt |
| Defendant-Appellant. | ) | Judge, Presiding |

JUSTICE HOLDRIDGE delivered the Opinion of the court:

Defendant, William Wilke, was charged with unlawful possession of manufacturing chemicals with intent to manufacture 30 to 150 grams of methamphetamine (720 ILCS 570/401(a)(6.6)(A) (West 2002)). He proceeded to a jury trial and was convicted of the charged offense. In this appeal, he claims his trial counsel was ineffective for three reasons: failing to request a Frye hearing on the method used by a State witness to calculate prospective methamphetamine weight; failing to seek preclusion of the mathematical formula used to calculate prospective methamphetamine weight; and failing to seek suppression of evidence. In a fourth claim, defendant argues that the circuit court erred in refusing to appoint new counsel for post-trial proceedings wherein defendant alleged that his present counsel was ineffective. We affirm.

BACKGROUND

Police officer Robert Andreina testified that on December 10, 2002, while patrolling in Braidwood, he left Snooker's Bar on Route 129 and followed a pick-up truck driven by defendant. Shortly after the "on/off" ramp at Route 6, Andreina activated his overhead lights and siren and followed defendant into the Manor Motel parking lot at Route 6 and Interstate 55. Defendant took three steps outside his truck before Andreina ordered him to the ground. Andreina had called for assistance, and a Channahon police officer arrived shortly after defendant was ordered to the ground.

Officer Edward Bischoff, who responded to the call for assistance, arrived at the Manor Motel and observed defendant on the ground at gunpoint a couple steps from his truck door. Bischoff said he handcuffed defendant and conducted a pat-down search for officer safety. The search revealed a wad of money about one inch thick in the inside pocket of defendant's jacket.

Prakash Silveri, the general manager of the Manor Motel, testified that defendant had been staying there since November 19, 2002. Defendant generally made timely payments for his room, but Silveri could not recall any luggage or boxes. He recalled seeing defendant at times carrying Wal-Mart bags, but he did not see any specific items inside the bags. Silveri saw defendant on the ground at gunpoint at the time of the arrest. Defendant was behind in rent at that time, and one of the officers paid the back rent.

Ken Simonich, an officer on the Metropolitan Area Narcotics Squad (MANS) in Joliet, testified as an expert in methamphetamine laboratories and production. His training consisted of a 40-hour class at Southern Illinois University in November of 2001. One object of the class was to become familiar with precursor materials in the methamphetamine production process. Part of

the class involved dismantling methamphetamine laboratories considering the volatility of the chemicals involved. The instant case was Simonich's first actual methamphetamine case, although he had worked on two or three others by the time of trial.

Simonich testified that on December 10, 2002, he was called to assist in an inventory search of defendant's truck. Several items were discovered in the back of the truck, including: a cooler (containing additional items), brillo pads, a strainer, a clear plastic jug, some gas tanks, another gas tank with PVC piping, boxes of Miracle Grow plant food, red tablets of pseudoephedrine, white jugs with spray tops, bottles of Heet, and a hose with a coupler. Simonich also searched defendant's motel room and discovered several items, including: red pills in packaging material, red and white pills containing pseudoephedrine in 15 blister packs (each containing 24 pills), three bottles containing 60 pills each, and a baggie containing 800 pills that looked similar to the others. One lithium battery was also found. Although these items could be legally purchased, they are ingredients in methamphetamine production, and Simonich believed they were intended for this purpose. No anhydrous ammonia was found during the searches.

Out of earshot from the jury, the State announced its intention to qualify Sanford Angelos, an agent for the United States Drug Enforcement Administration (DEA), as an expert witness. Angelos would testify to a mathematical formula used for determining how much methamphetamine could be produced with a given amount of precursor pseudoephedrine. The State also wished to present a chart to this effect. Although the chart was "available" to the defense, the State had not previously shared it because the prosecutor actually composed it

3

ninety minutes before trial during a discussion with Angelos. The chart was a visual illustration of the conversion to which Angelos would testify.

The trial judge reviewed pertinent case law from federal courts and observed that the matter involved an issue of first impression in Illinois. The judge cautioned that if Angelos were qualified as an expert, the State would have to proceed step-by-step as he rendered his opinion. Angelos then took the stand and testified to his qualifications. The judge qualified him as an expert in clandestine methamphetamine laboratories and, over a defense objection, in methamphetamine generally.

During his expert testimony, Angelos explained that all methamphetamine manufacturing processes require precursor ephedrine or pseudoephedrine. He said between 80% and 90% of the methamphetamine production in Illinois occurs through a method involving anhydrous ammonia and lithium batteries. He opined that the items recovered from defendant's truck and motel room, including over 3,500 pseudoephedrine pills, had the makings of a clandestine methamphetamine laboratory using this method. Although each item had a legitimate purpose when taken alone, he explained that they also played a part in methamphetamine production. His opinion about the makings of a laboratory was based on the quantity and combination of items recovered.

Angelos then testified to a formula for calculating how much methamphetamine could be produced from a given amount of pseudoephedrine. Although a gram-for-gram conversion is theoretically possible, a given amount of pseudoephedrine generally yields less methamphetamine because pseudoephedrine tends to lose part of its molecular structure during the conversion process. From case to case, variations occur in methamphetamine yield based

4

primarily on the sophistication of the laboratory and its operator. Accordingly, although "the reaction will make methamphetamine almost no matter what numbers you do," Angelos said, "how much at one time I cannot tell you." Instead, his formula was designed to ascertain the maximum and minimum yields possible for a given amount of precursor substance. Applying the formula to the amount of pseudoephedrine recovered in the instant case, he opined a maximum methamphetamine yield of 114.7 grams.

Based on his own laboratory simulations, Angelos' "textbook answer" for potential pseudoephedrine-to-methamphetamine conversion using the anhydrous ammonia and lithium battery method was from 95% to 100%. He had never actually achieved a 100% conversion rate. Regarding the items recovered in the instant case, Angelos acknowledged that they did not constitute a fully functioning methamphetamine laboratory. He could not say how much methamphetamine a person could produce with a single lithium battery because every person used a different "recipe." He testified that patina on certain items of evidence (the fittings of a gas tank and a hose) suggested that anhydrous ammonia had passed through those items.

Mark Brunzie, a MANS agent, testified regarding his interrogation of defendant. During the interrogation, defendant said the items recovered from the back of his truck were for his grandson's science project, and the money found on his person was from the sale of a boat. About two hours into the interview, Officer Simonich advised that a search warrant had been executed on defendant's motel room. Defendant then acknowledged that the items recovered in the room were his, stating that he bought them for friends in Flora to exchange for methamphetamine. He said the friends were going to cook the methamphetamine and it was easier for him to buy the ingredients "up

5

north" rather than in Flora. Defendant denied being a "cooker" but acknowledged being an addicted user of methamphetamine.

Kenneth Raiser, a forensic chemist, testified that he performed testing on what was originally a vial with a cork that had a residual amount of white substance on it. The substance contained methamphetamine.

The State then rested, and defendant's motion for a directed verdict was denied. Following closing arguments, the jury returned a guilty verdict.

Defense counsel filed motion for a new trial. Defendant also sent the judge a letter alleging that his counsel had rendered ineffective assistance for not filing a motion to suppress evidence. In the letter, defendant said he had given counsel the name of a witness who could support a motion to suppress. Included with the letter was an affidavit from Alfred Buckner purporting to support a motion to suppress.

Defense counsel subsequently filed a motion to withdraw from the case. In support of this motion, counsel explained to the judge that his relationship with defendant had broken down. The judge denied the motion, explaining that the proceedings would be considerably delayed if new counsel were appointed. The judge also found no ineffectiveness during the trial process, advising defendant that merely alleging ineffectiveness does not make it so. A defense motion for a new trial was denied as well.

After considering evidence in mitigation, and the parties' arguments as to sentencing, the judge imposed a sentence of 7½ years in prison. Defendant's motion to reconsider the sentence was denied, and he filed this appeal. He now claims that his trial counsel was ineffective for: (1) failing to request a Frye hearing on the method used

6

by Sanford Angelos to calculate prospective methamphetamine weight; (2) failing to assert a discovery violation regarding Angelos' formula for calculating prospective methamphetamine weight; and (3) failing to file a motion to suppress evidence. Fourthly, defendant asserts error in the trial judge's handling of his post-trial ineffectiveness claim.

## DISCUSSION

To prevail on an ineffectiveness claim, a defendant must establish two things: first, that defense counsel's performance was objectively deficient (i.e., he made errors so serious that he was not functioning as "counsel" for sixth amendment purposes); and second, that counsel's deficient performance caused prejudice to the defense (i.e., but for the unprofessional errors, a reasonable probability exists that the outcome of the trial would have been different). Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); People v. Albanese, 104 Ill. 2d 504 (1984). Regarding the second prong of this standard, a "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Strickland, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; People, 104 Ill. 2d 504. If no prejudice is shown, an ineffectiveness claim may be disposed of on the second prong without analysis on the first prong. Strickland, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; Albanese, 104 Ill. 2d 504.

### 1. Frye Issue

The Frye decision (Frye v. United States, 293 F. 1013 (D.C. Cir. 1924)) provides the test applicable in Illinois for determining the admissibility of scientific evidence. Donaldson v. Central Illinois Public Service Co., 199 Ill. 2d 63 (2002). Under this test, a court must first determine whether the method or technique at issue constitutes "novel" science. If not, no further hearing is required; if so, a so-called Frye hearing is required to determine whether the novel method or technique has gained general acceptance in the scientific community. Donaldson, 199 Ill. 2d 63. Without such acceptance, a novel scientific method or technique is not admissible. Donaldson, 199 Ill. 2d 63.

Defendant argues that his counsel was ineffective for failing to request a Frye hearing on Sanford Angelos' method for calculating methamphetamine yield from a given amount of precursor pseudoephedrine.

In People v. Dorsey, 362 Ill. App. 3d 263 (2005), a jury found the defendant guilty of unlawfully possessing a methamphetamine-manufacturing chemical with intent to manufacture 30 to 150 grams of a substance containing methamphetamine. The evidence showed that police officers recovered 552 pseudoephedrine pills during their investigation. Moreover, the defendant was apprehended during an admitted effort to collect 5,000 pseudoephedrine pills and manufacture 100 grams of methamphetamine. An expert witness for the State, using a 90% conversion yield formula, testified that 552 pseudoephedrine pills could produce up to 14.994 grams of methamphetamine. On appeal, the defendant raised an ineffective assistance claim because his trial counsel "did not request a Frye hearing [citation] on the method the State's expert used to calculate methamphetamine weight where no methamphetamine was manufactured." Dorsey, 362 Ill. App. 3d at 269. The court rejected this claim, noting that the procedures

8

for producing methamphetamine involve simple chemistry and are not scientifically unique.  Moreover, the court found no reason for a <u>Frye</u> hearing because the parties "only disagreed over the appropriate yield rate."  <u>Dorsey</u>, 362 Ill. App. 3d at 269.

We agree with this analysis.  The "science" in the instant case involves the chemistry behind converting pseudoephedrine to methamphetamine.  If the scientific community generally accepts that such conversion is possible, then a <u>Frye</u> hearing is not warranted.  Any arguments about defendant's particular ability to apply the chemistry do not raise a <u>Frye</u> issue; rather, they raise an issue of evidentiary weight.

It is undisputed in the scientific community that chemical processes exist whereby pseudoephedrine can be converted into methamphetamine.  Not even defendant contests this fact.  Given such acceptance of the underlying method, a <u>Frye</u> hearing is not required in the instant case.  <u>C.f.</u> <u>People v. Hickey</u>, 178 Ill. 2d 256 (1997) (the caliber of work performed by the person operating a laboratory does not invoke <u>Frye</u>; only the scientific principles underlying the work will trigger the need for a <u>Frye</u> hearing).  The dissent misses this point; failing, in the process, to cite any case where <u>Frye</u> was applied in the manner presently urged.

Defendant is also off base, referring to several federal cases for the proposition that "the proper inquiry is not what a theoretical maximum yield would be, or even what an average methamphetamine cook would produce, but what the defendant himself could produce."  This argument is problematic on multiple fronts.  First, the applicable federal law no longer supports defendant's position.  See <u>United States v. Martin</u>, 438 F.3d 621 (6th Cir. 2006) (describing a new system using a general theoretical yield rather than consideration of defendants' individual production capacity).

9

Moreover, defendant's argument contravenes the statutory language of the charged offense. The statute focuses on what defendant <u>intended</u> to produce, not on what he actually produced, or what he could have produced. The evidence against defendant included 3,908 pills containing a total of 124.7 grams of pseudoephedrine. Angelos testified that this amount could yield 114.7 grams of methamphetamine. This testimony is scientifically sound; under proper laboratory conditions, 124.7 grams of pseudoephedrine can be converted into 114.7 grams of methamphetamine. Defendant has not shown that he <u>intended</u> to fail so miserably at his conversion as to prevent him from yielding a mere 30 grams of methamphetamine (the minimum amount for the charged offense) from 124.7 grams of precursor pseudoephedrine.[1]

Arguments about different yields stemming from different laboratory conditions are simply misplaced in this context. Defendant is certainly entitled to raise such matters, but the appropriate time for doing so is during cross examination of the State's expert (or direct examination of a defense expert), not a <u>Frye</u> hearing. Differences in methamphetamine yield simply do not involve novel science; they involve personal

---

[1]This observation distinguishes the instant case from the portion of <u>Dorsey</u> where the court reduced the defendant's conviction. The reduction was based on the fact that it was scientifically impossible to yield the minimum statutory amount of methamphetamine from the amount of precursor pseudoephedrine involved. Such is clearly not the case here. Moreover, in <u>Dorsey</u> Justice Steigmann aptly observed: "The crux of this offense is defendant's *intent*, not his *ability*, to commit the crime charged." <u>Dorsey</u>, 362 Ill. App. 3d at 271 (Steigmann, J., dissenting).

applications of well known and commonly accepted scientific procedures. Defendant has mistaken a credibility issue for an admissibility issue. He has also misconstrued the applicable statutory language. In light of these observations, his counsel was not ineffective for failing to request a <u>Frye</u> hearing.

2. Discovery Issue

Next, defendant claims his counsel was ineffective for failing to assert a discovery violation regarding Angelos' conversion formula for calculating methamphetamine yield. The goal of discovery is to eliminate surprise and unfairness by affording an opportunity to investigate. <u>People v. Petty</u>, 311 Ill. App. 3d 301 (2000). Among other things, the State must use due diligence to disclose reports and statements of its experts. <u>People v. Padgett</u>, 248 Ill. App. 3d 1018 (1993). A discovery violation does not exist unless the questioned evidence is material and favorable to the accused (<u>People v. Walls</u>, 323 Ill. App. 3d 436 (2001)), and noncompliance with discovery rules does not warrant reversal absent a showing of prejudice (<u>People v. King</u>, 248 Ill. App. 3d 180 (1993)).

Defendant's trial began on July 8, 2003. On June 26, 2003, after a breakdown in plea negotiations, the State tendered Angelos' name through discovery. The State identified Angelos as an "expert in the manufacture of methamphetamine," included a copy of his address and resume, and advised that any other information regarding his testimony could be inspected, obtained, tested, copied, or photographed by arrangement. In light of this tender, defendant was not tried "by ambush" as he alleges. He was given advance notice that the State intended to elicit testimony regarding methamphetamine production from Angelos. This notice necessarily informed

11

defendant about prospective conversion testimony, since the evidence only included precursor pseudoephedrine.

Indeed the record shows that the defense was not surprised by Angelos' testimony at trial. On the contrary, counsel was prepared to attack Angelos' across-the-board conversion method with an argument that any conversion formula must account for defendant's specific production capability.

We also see no discovery violation in the State's use of the chart illustrating Angelos' conversion formula. Although this chart was not tendered to the defense, the record shows that it was not even available until ninety minutes before trial. The prosecutor simply made the chart during a pre-trial discussion with Angelos. Since the chart merely reflected Angelos' testimony without adding anything new, and Angelos was tendered as an expert witness beforehand, use of the chart was not error.

For the same reasons, we decline defendant's invitation to find that the trial judge committed reversible error in allowing Angelos to testify regarding conversion yield.

### 3. Suppression Issue

Next, defendant argues that his trial counsel was ineffective for failing to file a motion to suppress evidence. He devotes the bulk of his argument to pointing out what the State's evidence did not show. For instance, he argues that officer Andreina "never testified as to the nature of the traffic stop, never said he ran a driver's license check, and never said he determined whether warrants were outstanding." Such statements constitute an invitation to assume that some constitutional violation occurred in connection with his arrest and the ensuing events.

12

What defendant leaves out, however, is an accurate explanation of why the State's evidence on this matter was so general. The record shows that at the time of the traffic stop officer Andreina knew of an outstanding warrant for defendant's arrest on a charge of methamphetamine production. Defendant moved in limine to exclude all reference at trial to the outstanding warrant. His motion was granted, and that is why the State's evidence regarding the reason and nature of the stop was so general. We thus will not infer a constitutional violation from the generality. A defendant cannot request to proceed in one manner and later, on appeal, claim error in the course of action taken. See People v. Carter, 208 Ill. 2d 309 (2003).

Moreover, since defendant was arrested on a valid warrant, the subsequent search of his truck was justified. See, e.g., People v. Gipson, 203 Ill. 2d 298 (2003) (inventory search). The search of his motel room was justified as well, being supported by a separate judicially authorized warrant. Probable cause existed for that warrant based on the methamphetamine manufacturing materials found in defendant's truck, the fact that he was staying at the motel, and the outstanding arrest warrant on a charge of methamphetamine production.

Other points alleged by defendant (e.g., payment of his back rent by the police, and his rejection of the State's plea offer) have no bearing on the legality of the stop, defendant's arrest, and the searches at issue.

Accordingly, defense counsel clearly did not render ineffective assistance in failing to file a motion to suppress the evidence in question.

## 4. Appointment of New Counsel

The judge's denial of defense counsel's motion to withdraw, and his response to defendant's post-trial claim of ineffectiveness, rested primarily on time considerations. Such action should, however, rest on a preliminary review of the substance of the ineffectiveness claim. See People v. Moore, 207 Ill. 2d 68 (2003). The State acknowledges that the judge's conduct in this regard was "less than effective itself." Nevertheless, the State argues that any error committed by the judge was harmless beyond a reasonable doubt.

Our Supreme Court has explained that such harmless error may be found in appropriate circumstances. Cf., Moore, 207 Ill. 2d 68; People v. Nitz, 143 Ill. 2d 82 (1991). We believe the unique circumstances of the instant case present an appropriate instance for finding harmless error.

The basis of defendant's post-trial ineffectiveness claim was defense counsel's failure to file a motion to suppress evidence. Defendant has already raised the suppression issue for our review in this appeal. Having done so, he tied the success of the instant issue to the outcome of the suppression issue. We have already found that no reversible error occurred in counsel's failure to file a motion to suppress evidence. Thus, although the trial judge should have preliminarily addressed the substance of this issue on the record, we decline to deem this omission a basis for remanding. The purpose a remand would be preliminary substantive evaluation of a claim that, by defendant's own action, has already been decided against him in this court.

## CONCLUSION

For these reasons, the judgment of the Will County circuit court is affirmed.

14

Affirmed

O'BRIEN, J., concurs, and MCDADE, J., dissents.

JUSTICE McDADE, dissenting:

---

The majority stops at finding that "the 'science' in the instant case involves the chemistry behind converting pseudoephedrine to methamphetamine." Slip order at 10. I disagree. The State's expert witness did not merely opine that pseudoephedrine can be converted into methamphetamine. It is indeed "undisputed in the scientific community that chemical processes exist whereby pseudoephedrine can be converted into methamphetamine." Slip order at 10. Here, the expert opined, with the imprimatur of generally accepted scientific certainty, that 92% of a given source of pseudoephedrine can be converted into methamphetamine. Therefore, it is more accurate to state that the 'science' in the instant case involves not just the chemistry behind converting pseudoephedrine into methamphetamine, but specifically whether a known percentage of pseudoephedrine is consistently lost in that chemical process.

If 'science' tells us that the answer to both questions is "Yes," then the question for this court becomes whether that percentage is known and generally accepted in the scientific community. The State's expert referred to the percentage in question as the "conversion yield formula" although he offered no "formula" for arriving at the percentage but merely stated it as a conclusion. The substance of the expert's

15

testimony reveals that 'science,' as he understands it, tells us that 8% of the pseudoephedrine is lost in the conversion process[2].

In support of his argument that the "conversion yield formula" lacks general consensus in the scientific community, defendant cited several cases involving potential methamphetamine production in which the experts have testified to different percentages. In *People v. Reatherford*, 345 Ill. App. 3d 327, 340, 802 N.E.2d 340, 352 (2003), the expert testified that "some jurisdictions use an 80% to 90% yield rate, but his office arrived at a 60% yield because 'it was the most lenient[,] giving the most margin for error and the most leniency towards the suspect.'" *Reatherford*, 345 Ill. App. 3d at 333, 802 N.E.2d at 346-47. In *People v. Snyder*, No. 4-00-0950, slip order at 5 (January 28, 2003) (unpublished order pursuant to Supreme Court Rule 23), a forensic scientist with the Illinois State Police, qualified as an expert, testified to a 92% yield. *Snyder*, slip order at 6. On cross-examination, the expert testified that the 92% yield would occur in ideal laboratory conditions but that he could not testify how much methamphetamine could be manufactured in the field because each lab is different. In

---

[2] Concerning the batches of pills recovered from defendant, the State's expert testified, respectively, that 71.2 grams of pseudoephedrine would produce 65.5 grams of methamphetamine, 15.1 grams of pseudoephedrine would produce 13.9 grams of methamphetamine, and 38.4 grams of pseudoephedrine would produce 35.3 grams of methamphetamine. Despite the expert's assertion that his calculations were based on a 100% theoretical yield, in each case, the weight of the methamphetamine that the expert opines could be produced is 92% of the pseudoephedrine seized.

*People v. Feldman*, No. 4-03-0653, slip order at 7 (May 19, 2004) (unpublished order pursuant to Supreme Court Rule 23), the State's expert testified to *both* a 92% yield *and* a 60% yield. The expert then testified that clandestine methamphetamine labs generally produce 80 to 90% yields. *Feldman*, slip order at 7.

Defendant argues the above cases "display no discernable standard of general acceptance." The State admits "[d]ifferent conversion rates have been used in the cases cited by defendant." The majority inexplicably chose not to explain this obvious disagreement on the "conversion yield formula" in the scientific community that has, it concludes, generally accepted it. However, looking at the evidence in this case alone, the State's expert, Angelos, admitted that a person may produce something less than the mathematically maximum amount possible and that he could not say beyond a reasonable doubt what that amount would be. In fact, the State admits that "no one can really predict the 'actual yield' of methamphetamine that will be produced at any one time from a given amount of pseudoephedrine." Nonetheless, the State argues, and the majority must tacitly agree, that "this lack of a general consensus on the exact conversion rate percentage does not affect the accepted mathematical and scientific principles underpinning the conversion formula itself, nor does this lack of a consensus necessitate a *Frye* hearing."

While I agree that methamphetamine production involves the chemical reduction of pseudoephedrine and that some of the pseudoephedrine is lost in that process, the question for purposes of the offense charged, and the basis of the expert's opinion at issue, is how much pseudoephedrine is lost. I cannot agree with the majority's logic that because it is well accepted that chemical reduction occurs there need not exist a

17

consensus in the scientific community as to how much it occurs.  The question is not whether defendant could have manufactured any quantity of methamphetamine.  But that is the only question answered by the majority's conclusion that the scientific community agrees that "conversion is possible."  Slip order at 10.

The amount that can be produced is critical in a case such as this where (1) no methamphetamine has actually been produced, and (2) the crime with which defendant has been charged is *intent* to produce a specific amount of methamphetamine.  The conversion formula in this situation must be known and generally accepted because the amount intended to be produced is an element of the crime.  Absent that degree of certainty, the guilt of any particular defendant is nothing more than speculation depending on which expert the State uses.

The issue raised on appeal is whether counsel was ineffective in failing to request a *Frye* hearing on the State's evidence as to *how much* methamphetamine defendant could have produced.  The State does not dispute that how much methamphetamine could be produced is an element of the offense in section 501/401(a)(6.6).  I accept the State's position that chemical reduction itself is not "new" or "novel" science, but that is not the issue in this case.  The "scientific principle upon which the opinion is based" in this case is the percentage of pseudoephedrine that is converted into methamphetamine in clandestine methamphetamine laboratories employing chemical reduction.  The State goes so far as to admit, and the available authority confirms, that the community lacks general consensus on that percentage.  Nor did the State present evidence on appeal from which this court could find a general

18

consensus on the appropriate percentage, choosing instead to assert, without authority, that "yields of between 95 and 100% conversion rate is 'the textbook answer for all reductions.'" (This assertion ignores their own expert's testimony in this case of a 92% yield.) In one case, the expert apparently chose a conversion rate purely at random in an effort to be more "lenient." Nonetheless, the majority concludes that counsel was not ineffective for failing to request a *Frye* hearing. Because I believe the conclusion is incorrect based on the applicable law and the evidence in this case, I respectfully dissent.