VAIDIK, Judge,
concurring in result.
I concur in full with the majority opinion that the State presented insufficient evi *683 dence to establish that Harmon manufactured at least three grams of methamphetamine.
I write separately to address the issues with determining generally the amount of methamphetamine that is involved in the manufacturing in a particular case. When the manufacturing process is complete and the methamphetamine is in either a pure or adulterated state, there is not an issue in determining the weight; the methamphetamine is in its final form and the drug can easily be weighed.
Issues arise, however, when the manufacturing process has not been completed and the methamphetamine is still mixed in with liquid ingredients. Varying methods have been used to determine the actual weight of the methamphetamine produced in this situation; one of those methods is weighing the solid methamphetamine and the liquid ingredients used in the manufacturing process together. Hundley v. State, 951 N.E.2d 575 (Ind.Ct.App.2011), trans. denied; Traylor v. State, 817 N.E.2d 611 (Ind.Ct.App.2004), trans. denied. Another method is determining the amount of methamphetamine that will be produced using a conversion ratio based on the amount of ephedrine or pseudoephed-rine that is present. Halferty v. State, 930 N.E.2d 1149, 1153 (Ind.Ct.App.2010), trans. denied,[5]
The majority assumes, but does not hold, that the entire weight of the liquid can be considered when determining the weight of the methamphetamine that Harmon manufactured. Op. p. 677-78 n.2. I find the method of measuring the weight of the methamphetamine and the liquid together to be inherently problematic and to require ascertaining the legislative intent behind the manufacturing-of-methamphetamine statute. I conclude that the legislature did not intend for the liquid byproduct of the manufacturing process to be included in the measurement of the weight of methamphetamine involved.
Indiana Code section 35^8-4-1.1 delineates the different classes of felonies based on the weight of the methamphetamine involved, and the dividing line between a Class A and a Class B felony is three grams. The statute states:
(a) A person who:
(1) knowingly or intentionally:
(A) manufactures;
(B) finances the manufacture of;
(C) delivers; or
(D) finances the delivery of;
methamphetamine, pure or adulterated; ... commits dealing in methamphetamine, a Class B felony, except as provided in subsection (b).
(b) The offense is a Class A felony if:
(1) The amount of the drug involved weighs three (3) grams or more;....
Ind.Code § 35-48-4-1.1. The language of the statute itself provides the best evidence of legislative intent, and we strive to give the words in the statute their plain and ordinary meaning. Brown v. State, 912 N.E.2d 881, 894 (Ind.Ct.App.2009).
Using the word “grams” as the unit of measurement in the statute indicates that it is the solid drug that is intended to be measured, not the liquid that is used to manufacture the drug. As the majority indicates, grams are a unit of mass whereas it is a more common practice to measure liquids in units of volume. Op. p. 680 n.3; see, e.g., Using Metric Units and *684 Symbols, Northern Michigan University— Computing for Teachers, http://ellerbruch. nmu.edu/classes/es255w02/cs255students/ MAGNUSO/P9/common.pdf (last visited June 11, 2012) (“It takes about 29 grams to equal one dry ounce.... [A liter] is basically a fluid volume unit as is the smaller metric unit called the milliliter (ml).”) (emphases added).
Also, construing the statute in a way that would include the liquid along with the methamphetamine would defeat .the purpose of delineating Class A and Class B felonies at three grams, as it could potentially eviscerate the Class B felony manufacturing-of-methamphetamine charge. If the methamphetamine was found in the middle of the manufacturing process and the weight of the liquid was included in the total weight of the drug, there would never be an instance where the amount of methamphetamine would be less than three grams. The legislature surely did not mean to create a statute that could never be applicable. Additionally, Class A or Class B felony status would depend on the accident of what stage in the manufacturing process the police found the methamphetamine. This cannot be what was intended.
The statute also includes “pure or adulterated” methamphetamine when measuring the amount of methamphetamine involved in the manufacturing process. Another panel of this Court has found that both the liquid and solid should be considered when determining the weight of the drug being manufactured. Hundley, 951 N.E.2d at 581. In Hundley, this Court held that when “the intermediate step is so near the end of the manufacturing process that the final product is present in the chemical compound, that substance qualifies as an ‘adulterated drug’ for purposes of our manufacturing statutes.’ ” Id. I do not agree.
“Adulterate” is defined as “[t]o debase or make impure by adding a foreign or inferior substance.” Black’s Law Dictionary 52 (9th ed. 2009). I do not think this definition is meant to include a drug in the middle of the manufacturing process; it is only meant to refer to a debased final product. So, to add a substance after the manufacturing process is to adulterate a substance, but products used in the manufacturing process do not adulterate the byproduct produced. Accordingly, I do not believe that the legislature intended the liquid ingredients used to manufacture methamphetamine to be included in the calculation of the amount of drugs involved.
A more appropriate method for determining the amount of methamphetamine a person is manufacturing is using a conversion ratio based on the amount of.ephedrine or pseudoephedrine that is present. This method uses a scientifically determined formula to calculate how much methamphetamine would be produced based on the amount of ephedrine or pseu-doephedrine that is used in manufacturing. Using a conversion ratio allows for a reliable measure of the weight of the drug that will be produced without adding in the additional weight of any precursors that are still present in the manufacturing process when the methamphetamine is discovered.
Other jurisdictions around the country have adopted this method, and expert witnesses are employed to apply the conversion ratio due to its case-by-case variability. See, e.g., People v. Wilke, 367 Ill.App.3d 130, 304 Ill.Dec. 933, 854 N.E.2d 275, 278 (2006) (“an agent for the United States Drug Enforcement Administration ... would testify to a mathematical formula used for determining how much methamphetamine could be produced with a given amount of precursor pseudoephed- *685 riñe.”); Hill v. State, 161 S.W.3d 771, 777 (Tex.App.2005) (“[Agent from Deep East Texas Regional Narcotics Task Force] replied that by using the amounts listed on each package, he calculated a total of 5,760 milligrams of pseudoephedrine. He further testified that such an amount of pseu-doephedrine would yield approximately 3.5 grams of methamphetamine after completion of the ‘cooking process.’”); State v. Camerer, 29 S.W.3d 422, 424 (Mo.Ct.App.2000) (“The criminalist explained how pseudoephedrine and anhydrous ammonia are used to manufacture methamphetamine. One gram of pseudoephedrine normally yields one gram of methamphetamine.”). I believe this is the best method to use to determine yield when the methamphetamine is in the middle of the manufacturing process. The State recognized in its oral argument the existence of the conversion ratio. As an alternative argument, the State contends that from the amount of ephedrine used in the manufacturing of the completed product, the jury could extrapolate as to how much methamphetamine the unfinished manufacturing process would produce. I do not agree with the State.
It is essential that an expert witness be present at trial to testify to the conversion ratio and how it applies in each case. As we indicated in Halferty, a conversion ratio between ephedrine/pseudoephedrine to methamphetamine can be used, but it can change “depending on the cooking process, on whether pill binders are stripped from the ephedrine/pseudoephedrine, and on the person who is ‘cooking’ the methamphetamine.” 930 N.E.2d at 1153. With so many ingredients involved in the manufacturing of methamphetamine and so many different factors that can alter how those ingredients affect the yield, determining yield is not a task that should be undertaken by a lay person. When the difference of such a small amount can have such a profound effect on a potential sentence, the trial court needs to be sure that the yield is accurate.[6]
Therefore, while I agree with the majority that there is insufficient evidence to establish that Harmon manufactured at least three grams of methamphetamine, I do not agree with the assumption that my colleagues make about the way in which the yield of methamphetamine can be measured. I would find that only the finished product, pure or adulterated, can be considered when determining the amount of the drug that is being manufactured or that a conversion ratio and an expert witness should be used when the manufacturing process is not complete and the yield is uncertain.

. At first blush, there does not appear to be a split in our Court regarding how to measure the methamphetamine involved; both methods are acceptable. But, if the measurement of the methamphetamine involved can include the liquid, then the weight of the drug will always be greater than three grams and the conversion-ratio method will never be used.

. One exception would be when the amount of the drugs being manufactured is so large as to permit a reasonable inference that the element of weight has been established. See Halsema v. State, 823 N.E.2d 668 (Ind.2005).