2021 IL App (1st) 190823-U

SIXTH DIVISION
July 30, 2021

No. 1-19-0823

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 16 CR 18653 |
| | ) | |
| RONDALE PARKER, | ) | Honorable James B. Linn, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Justice Oden Johnson concurred with the judgment.
Presiding Justice Mikva concurred in part and dissented in part.

**ORDER**

¶ 1  *Held:*  The State did not withhold evidence from the defense; defendant's conviction for second-degree murder was not against the manifest weight of the evidence; and the trial court gave appropriate weight to aggravating and mitigating circumstances before sentencing defendant. Affirmed.

¶ 2  Following a bench trial, defendant, Rondale Parker, was found guilty of second-degree murder. The trial court sentenced defendant to 30 years in prison. On appeal, defendant contends that: (1) the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) his conviction for second-degree murder was against the manifest weight of the evidence; and (3)

the trial court failed to give appropriate weight to mitigating circumstances before sentencing him. For the following reasons, we affirm.

¶ 3                              I. BACKGROUND

¶ 4     Defendant was charged by indictment with six counts of first-degree murder in the shooting death of Laron McCoy (the victim). The following evidence was presented at trial.

¶ 5     Tequila Triplett, the victim's aunt, testified that she knew the victim as "Rock." On July 5, 2016, at about 1 p.m., she saw the victim pull up in front of her mother's house at 8139 South Burnham, in Chicago. Tequila lived across the street. She was talking to her mom when the victim asked for Tequila's son, Charles Bolden. The victim and Charles worked together washing dishes at a restaurant, so they would sometimes ride to work together. Tequila told the victim that Charles had just gone out for cigarettes. The victim left and then came back after a bit to tell Tequila he had not seen Charles, but to have Charles call him. He then went into Tequila's house across the street, at 8136 Burnham.

¶ 6     Tequila testified that she then saw "Coolie" and his brother, defendant, walking by. Tequila had known both Coolie and defendant for about 15 years because they were about the same ages as her sons. She had two other sons, Raphael and Sergio. Coolie told her that Rock (the victim) had swerved by his car.

¶ 7     Coolie and defendant then stood in front of Tequila's house. Tequila walked across the street and into her house. She saw the victim in her house and talked to him briefly. He looked out the window and saw Coolie and defendant and asked her what "they was on." Tequila told him, "[T]hey said something about you was swerving by their car." The victim exited the house and walked over to Coolie and defendant, in front of Tequila's mother's house. They started "moving hands" like it was "getting serious," so Tequila walked out of the house and into the

2

middle of the street. She heard the victim say he did not have to explain himself "how he drive" and then defendant "start shooting him in his face."

¶ 8    Tequila testified that she did not see any weapons in the victim's hands. She did not hear the victim threaten either Coolie or defendant. Both Coolie and defendant ran away after they shot the victim. A neighbor told Tequila not to touch the victim.

¶ 9    Tequila testified that one of her sons, Raphael, was in Tequila's mother's house, asleep on the floor. She explained that he had a bladder problem and was "laying in piss." He was not outside during the shooting.

¶ 10   Tequila went to the hospital on the day the victim was shot and stayed a few days. Shortly after being released from the hospital, she spoke to detectives about what she had seen on the date in question. She identified photos of both Coolie and defendant.

¶ 11   On cross-examination, Tequila testified that she never knew the victim to own a handgun and had never seen a handgun around his waist before. On the day in question, Coolie and defendant stood directly in front of Tequila's mother's house. Defendant had his hand on his pocket, which concerned Tequila because she thought he had a weapon in his pocket. She testified that she did not tell the victim that defendant had something in his pocket when she went across the street to her house. The victim looked out the window and said ,"What are these guys on?" To which Tequila answered, "[I]t looks like they on something." Tequila testified that she meant they were up to something. And then the victim walked out of the house.

¶ 12   Tequila testified that the victim did not have a gun on him when he walked out of the house. After he was shot, she stayed with him until the ambulance arrived, but did not talk to police because she was in shock.

¶ 13    Christine Triplett, Tequila's mother, testified next. Christine testified that she knew the victim from her grandsons and treated him like a grandson as well. On the date in question, she was sitting on her porch. The victim arrived at 1 p.m., and asked for her grandson, Charles Bolden. He was going to give Charles a ride to work. Tequila was there as well. The victim went to look for Charles but then came right back. Christine thought he then left again, but he had just parked past 8136 Burnham.

¶ 14    Christine testified that shortly thereafter, defendant and Coolie came by and asked where the victim was. She saw the victim come out and start talking to Coolie and defendant. She heard the victim say something like, "I drive like that anyway. I ain't got to explain nothing to you." He turned his shoulder like he was going to walk away and then defendant started shooting him. Christine went inside her house and called the police. When they arrived, she told the police defendant shot the victim. She identified both defendant and Coolie in a photo array.

¶ 15    Christine testified that when the victim was shot, he had a beer can in his left hand. He was trying to hide it because Christine had never seen him drink alcohol. She testified that she did not have anything in his other hand.

¶ 16    She also testified that her grandson, Raphael, was in custody on a pending felony charge, and she was not given any promises in her grandson's case for her testimony. Christine testified that when the shooting occurred, Raphael was in the house "laying on the floor," and that he was in "a puddle of pee pee because he urinates. He still urinates because of his bladder was messed up." She never saw Raphael exit her house at any time after the victim was shot.

¶ 17    On cross-examination, Christine testified that when Coolie and defendant stood in front of her gate, Tequila went across the street. A short time later, the victim came outside. She heard him say he "wasn't on nothing," and his right hand was up at face level. When she heard the first

shot, she ran inside but then came right back out. The victim stood awhile before eventually falling. An audio was played on Christine's phone call to 9-1-1, and at the beginning she can be heard calling for Raphael. Christine testified that Raphael never got up.

¶ 18    After several stipulations, the State rested.

¶ 19    Raphael Triplett testified first for the defense. Raphael testified that on the day in question he was living at 8139 South Burnham. He was not suffering any illness on that day and was not laying in the front room of Christine's house in his own urine. He was outside. He saw the victim drive up and go into his mom's house across the street. The victim was inside for no more than five minutes and then came back out. He stormed passed Raphael and stated, "There goes [defendant]." Defendant was with his brother, Coolie. The victim was fidgeting with his waistline. Defendant "tried to walk away, you know, [the victim] upped the gun." Defendant then "turned around and shot him."

¶ 20    Raphael testified that the victim fell to the ground, and "I got the gun off the ground that [the victim] had." Raphael went into the alley in the back of 8139 South Burnham and threw the gun in a garbage can. Prior to the victim pulling out a gun, he had not seen a gun in defendant's or Coolie's hands. He never told the police what he saw.

¶ 21    On cross-examination, Raphael testified that he was in custody for a pending aggravated vehicular hijacking with a firearm. On January 17, 2017, Raphael gave a signed statement about the events in question. This meeting took place before he had been arrested for his pending felony. In June 2018, he met with the assistant State's Attorney (ASA), defense attorney, and two detectives. When asked if it was true that at the June 2018 meeting he said his written statement was not in fact correct, Raphael responded, "No, sir." Defense counsel objected and a

sidebar occurred. After the sidebar, the State asked Raphael if it was true that he denied taking a firearm off the victim at the June 2018 meeting, to which Raphael responded, "No, sir."

¶ 22    Raphael testified that when the victim was shot, he was the only one outside. He picked up the victim's gun from the ground because of "instincts." Raphael testified that shortly before the victim was killed, he had a "disagreement" with defendant about money owed to defendant and Coolie for cannabis.

¶ 23    On redirect examination, Raphael stated that he saw the victim point a gun at defendant and cock his gun before defendant shot the victim.

¶ 24    On recross-examination, Raphael testified that he did not know why he did not say in the statement that he gave to the defense investigator in January of 2017 that the victim pointed a gun at defendant.

¶ 25    Darien Garrett testified that he knew defendant from the neighborhood but did not know the victim. On the day in question, he was walking through some yards and saw Raphael. He then saw the victim standing on a porch across the street talking to a "young lady" named Gianna. Garrett testified that he heard the victim say, "If you want it with my cousin, you want it with me." His cousin that he was referring to was Raphael. Garrett saw the victim jog slowly across the street "clutching something at his waistband." When he moved his hand to pull up his pants, Garret saw "a gun shaped item." Garrett went to the open field next to Christine Triplett's house and heard arguing. Shortly after that, he heard gunshots. He did not see the shooting.

¶ 26    A day or two later, Garrett saw Raphael, who told him that he "removed a gun from the scene, a watch and some weed."

¶ 27    On cross-examination, Garrett testified that it was rumored around the neighborhood that the victim was looking for defendant due to a disagreement between Raphael and defendant and Coolie. He believed that Raphael stole weed from Coolie.

¶ 28    Deshawn Lucas testified that he grew up with defendant in the neighborhood and knew his brother Coolie. He also knew the victim from the neighborhood. He heard that the victim was looking for defendant and Coolie "about something that happened around the neighborhood." It was an argument about marijuana that Raphael had taken "or something." Lucas pled guilty to armed robbery in 2009 and served five years of his ten-year sentence. He has not been arrested for anything since he was released from prison.

¶ 29    Lucas testified that on the day in question, he was sitting on the porch next to Tequila's house. He saw defendant and Coolie walking up the block. Lucas asked where they were going, and they answered that they were going to see "Dough Man," which was the neighborhood barber. He then saw the victim come out of Tequila's house with a gun in his hand. Lucas testified that, "I can't describe it. I just know it was, like, a metal, like bright, like, chrome kind of." Lucas went into the gangway next to the house he was at when he saw the gun. As he turned to go through the gangway, he heard a shot. He got low and waited for a minute. When he came out, he saw the victim on the floor with a gun. He then saw Raphael come running out of Christine Triplett's house. Raphael and "Sugarman" came running out together and searched the victim. Raphael grabbed the gun off the ground, and "Shug" searched the victim and then they ran away. Lucas did not call the police and tell them what he observed. He stated, "In my neighborhood it's dangerous to call the police, to the police if you say anything you end up dead."

¶ 30    On cross-examination, Lucas testified that he did not see defendant shoot the victim, he only heard shots.

¶ 31    It was then stipulated that the victim had been convicted of aggravated robbery for an incident that happened in 2011 and was given two years of probation.

¶ 32    Defendant testified next. He testified that his older brother Coolie was "found shot dead in his car last year, like, eight months after this incident." The car was located about two blocks from where the incident occurred.

¶ 33    When defendant was 15 years old, he was charged and convicted of armed robbery and sentenced to 7 years in jail. He served three and a half years.

¶ 34    Defendant testified that he knew Raphael Triplett from growing up. In the days and weeks before the shooting, "several females" had been telling defendant that the victim was "looking for" defendant because the victim "figured me and his cousin Sugarman got into a fight, like, two months prior." There was also an incident where Raphael stole cannabis from Coolie.

¶ 35    On the day in question, defendant met up with Coolie at approximately 8 a.m. at 81st and Muskegon. They were waiting for their barber, Dough Man, but he was not ready to see them that early in the morning. Later they received a call from Dough Man, so they walked to 83rd and Burnham. At that time, defendant had a gun in his pocket. He was not legally allowed to carry a firearm and did not have a concealed carry permit or a Firearm Owners Identification (FOID) card.

¶ 36    As they were walking, defendant saw Deshawn Lucas, and told him they were going to get haircuts. There were other people out on porches. He saw the victim coming out of Tequila's house. The victim "grabbed his gun out of his pocket and put it on his waist." The gun was "smoke grey with a brown handle." Defendant had seen him with the gun before. Defendant

8

testified that the victim said, "You all jumped on my cousin." The victim then pulled out a gun and defendant dropped his cell phone. Coolie, who had been talking on his phone, told the person on the phone, "He just upped the gun, he just pulled a gun on us." The victim had his gun pointed at defendant and his brother and was waving it back and forth.

¶ 37    Defendant testified that while the victim was pointing the gun at him, he thought the victim was going to shoot him. He told the victim they would leave and as he turned, he put his hands in his pocket. When he turned around, the victim was looking towards Raphael on the other sidewalk, so defendant turned and shot the victim four or five times. Defendant shot him because he was scared the victim was going to kill him. He then ran north with his brother and went to Coolie's car on 80th and Muskegon. Defendant was arrested three or four months later.

¶ 38    On cross-examination, defendant testified that when they were walking down Burnham on the day in question, he did not see Christine Triplett on her porch. He saw Raphael in the doorway of Tequila's house. He never saw Tequila there. When the victim looked towards Tequila's house, defendant had a chance to pull out his gun.

¶ 39    Sergeant Donovan Jackson then testified in rebuttal for the State. Sergeant Jackson testified that he was assigned to investigate the homicide in question. On June 27, 2018, he was present for a conversation with Raphael Triplett. His partner, Gregory Buie, a State's attorney, and Raphael's attorney were also present. At that time, Raphael, who was in custody, indicated that he had not actually witnessed the homicide. He said he never saw a gun, and never took a gun on the day of the homicide. This conversation was not memorialized.

¶ 40    Carnell Smith testified next in rebuttal. He knew defendant, Coolie, and Raphael from the neighborhood. A couple of days after the shooting, he had a conversation with Raphael. On February 25, 2018, Smith met with an investigator for the defense. He gave a handwritten

statement. He told the investigator that Raphael came over to his house two days after the shooting and he asked him about it. He asked Raphael why he just "sat there" while the victim got shot. Raphael answered that he was in the house, he heard shots, and then he came outside and saw a gun on the ground, and saw the victim laying there. Smith testified that Raphael said he did not see anyone shooting a gun. Raphael told Smith that he then ran with the gun, but did not tell Smith what he did with it.

¶ 41 At the close of evidence, defense counsel renewed his objection to the cross-examination of Raphael about the conversation he had with the prosecution in June 2018, in the presence of law enforcement officers. The State responded that there were no reports or notes generated from the interview, and therefore there was no discovery obligation. The State argued that the evidence of the June 2018 meeting was presented in rebuttal, and the prosecution did not have to disclose that a defense witness was now claiming that something is a lie.

¶ 42 The trial court noted that it had already overruled this objection and then stated in part:

"I listened carefully to all the witnesses in this case. I find it wholly inexplicable that you have witnesses like Tequila and Christine Triplett that would tell me under oath that Raphael Triplett was laying in his urine because he's got a bladder problem ***."

He is laying on the floor in his urine, that they would just make that up out of nowhere. That there is no way in this world that that could happen. I believe that they [were] correct about where he was and why he was there. I find his testimony and this business about [the victim] coming out there with a gun to be and the fact that Raphael would take a gun used by [the victim] and run away and

throw it in the garbage, I found it to be not true or accurate. I do not believe that for a second.

I don't believe that [the victim] had a gun that day at all. I do know that for whatever reason [defendant] was excited and let that be known about the way he had been driving, he, being [the victim], had been driving, there was prior history, prior anosmous [*sic*] and the anosmous [*sic*] extended about different people and on different events.

\*\*\*

The argument didn't happen – the shooting didn't happen in the total vacuum. There were things that led up to it. There was excitement. [The victim] was drunk. [The victim] did have a history of violence but he wasn't armed that day.

So what happens? [Defendant] shoots him in the face multiple times. The only person that shot that day was the defendant. He shot an unarmed man, although he shot an unharmed [*sic*] man that had came towards him apparently or perhaps with some bad intentions.

I cannot say that this is in any way justified. This is a criminal act. It is murder. There were circumstances that led up to it. It wasn't something that was planned beforehand. He went there for a haircut with a gun in his pocket.

He let things from the past and from the present, minor things blow up and things did blow up. He may have thought that he needed – that he was being provoked and hay have thought somehow falsely that he needed to defense [*sic*] himself which was really stretching it.

The bottom line, he is guilty of murder in the second degree. That will be the finding. Bond revoked. Presentence investigation will be ordered."

¶ 43     At the sentencing hearing, Detective Thomas Dineen testified first for the State. He testified that he was assigned to do a follow-up investigation on an aggravated assault/shots fired incident in the area of 8139 South Burnham, a separate incident from this case. He spoke to Christine and Tequila Triplett, who identified defendant as the person that fired shots outside of that address. They told Detective Dineen that they did not wish to proceed with charges against defendant.

¶ 44     Officer Pruszewski testified that he was assigned to assist in an investigation of a shooting that occurred on May 21, 2008. A witness identified defendant as the person that shot him in the foot.

¶ 45     Defendant's mother testified in mitigation.

¶ 46     The trial court then stated:

"This happened on July 5, 2016. The evidence at the trial was very disputed. I did not believe that there ever was another gun that [the victim] had. I thought that was false testimony that the Court received on that topic.

That being said, I did understand that there was something going on, criticism about the manner in which somebody was driving, the person – [the victim] being intoxicated and acted in a way where he came out angry about that. [Defendant] did what he did with a gun that he never should have had, especially as an already-convicted felon. And he knew that. And he shot and executed this man on the street as he did.

And with all of that, this court tried very hard to listen carefully to all of the facts and circumstances and gave as much benefit of the doubt as the law and the facts would allow me to do and he was found guilty of second-degree murder instead of first-degree murder with a gun that would have involved the life sentence without the possibility of parole.

Now I have to consider the range for what to do with [defendant] for the offense of second-degree murder. And I know the facts are what they are on this case, but I also know about him and the things I heard from his mom, Cathy Broom. ***.

But the fact is that there's something going on with [defendant] that's way above whatever his mom has provided for him. He's got a dark side to him. The facts in this case are particularly egregious. If you add on the fact that he's already been convicted of armed robbery having been sentenced as an adult on a previous matter – I won't even consider the fact that right after this homicide occurred he was arrested later with a different gun altogether later. I said I won't consider that because he's not – that case is still in a trial posture where he's – or where it hasn't even been tried yet. He's presumed to be innocent, so I won't consider that against him, but I do see problems with [defendant]. I have an obligation to be fair to him and I believe I was innately fair to him during the course of this trial. Sentencing, I knew I would be fair to him, but I also must be fair to the public.

I think he's a danger. I think he's a threat to the community. He's already killed. I think his proclivity to use handguns in the manner described are a grave

concern. I find he's eligible for an extended term to the extent I can, so the

sentence will be 30 years in the penitentiary."

¶ 47    Defendant now appeals.

¶ 48                                    II. ANALYSIS

¶ 49    On appeal, defendant contends that: (1) the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) his conviction for second-degree murder was against the manifest weight of the evidence; and (3) the trial court failed to give appropriate weight to mitigating circumstances before sentencing defendant.

¶ 50                              A. *Brady* Violation

¶ 51    Defendant's first argument on appeal is that the prosecution failed to disclose information to defense counsel that was both exculpatory and impeaching. Specifically, defendant contends that the State had an obligation to tell defense counsel about Raphael's interview with the prosecution in which he allegedly recanted his prior handwritten statement. In *Brady*, the United States Supreme Court held that the prosecution violates an accused constitutional right to due process of law by failing to disclose evidence favorable to the accused and material to guilt or punishment. See *People v. Harris*, 206, Ill. 2d 293, 311 (2002), citing *Brady*, 373 U.S. at 87.

¶ 52    A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment. *People v. Burt*, 205 Ill. 2d 28, 47 (2001). Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *Harris*, 206 Ill. 2d at 311. A "reasonable probability" of a different result is a "probability sufficient to undermine confidence in the outcome." *United States v.*

*Bagley*, 473 U.S. 667, 682 (1985). "It is not enough that the evidence might have helped the defense to be considered material, the evidence must reasonably be expected to affect the outcome of the case." *People v. Crisp*, 242 Ill. App. 3d 652, 666 (1992). Though the judgement of the trial court in these matters is given great weight, a reviewing court will find an abuse of discretion when a defendant is prejudiced by the discovery violation and the trial court fails to eliminate the prejudice. *People v. Walls*, 323 Ill. App. 3d 436, 441 (2001).

¶ 53       The *Brady* disclosure requirement has been codified in Illinois in Supreme Court Rule 412(c) (eff. Mar. 1, 2001), which provides in relevant part:

> "(c) Except as otherwise provided in these rules as to protective orders, the State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor."

¶ 54       Here, Raphael was called as a defense witness, and his testimony on direct examination was consistent with his prior handwritten statement. He testified that he witnessed the shooting, that the victim was the aggressor and had a gun, and that Raphael took the victim's gun after the shooting and disposed of it. During cross-examination, however, the State asked about Raphael's interview with the State, police officers, and his own counsel in June 2018. When asked whether Raphael had recanted his prior handwritten statement during that interview, Raphael responded that he had not. Defense counsel then objected and asked for a sidebar, which was not recorded by the court reporter. The trial court then stated that the objection was overruled and permitted the State to continue with its cross-examination.

¶ 55    The State asked Raphael if it was true that he denied taking a firearm from the victim, and Raphael stated that he did take a gun off the floor. In other words, he denied recanting his statement in June of 2018, and testified consistently with his handwritten statement at trial.

¶ 56    In rebuttal, Sergeant Jackson testified that he was present on June 27, 2018, for the conversation that the prosecution had with Raphael. During the interview, Raphael stated that he did not witness the victim's homicide and that he never saw the victim with a gun, and never took a gun from the victim. No notes were taken of the conversation, and he did not see anyone else taking notes. After Sergeant Jackson testified, the following colloquy took place:

> "[COURT]: Let me inquire. Did the State's attorney prepare some kind of memorialization of the colloquy with Raphael Triplett to hand to the defense? Was any paper made of that?
>
> [STATE]: No, Judge. No notes were taken.
>
> [COURT]: Was any notice given to the defense about that?
>
> [STATE]: It was given to him after we learned on November 14th that Raphael Triplett was going to stick to his prior defense investigator statement.
>
> [COURT]: You made it known orally, but there was never any reports made about that by your office.
>
> [STATE]: Right, no reports.
>
> [COURT]: Okay. All right. Call your next witness.
>
> [DEFENSE COUNSEL]: Judge, if I may make a record. The defense found out about that conversation when Raphael Triplett was cross-examined regarding it. I objected and we did a sidebar without a court reporter and during the course of

16

> that sidebar, I asked for notes or whey I wasn't informed prior to it. That's what went on.
>
> [COURT]: And there weren't any, right?
>
> [DEFENSE COUNSEL]: There weren't notes, but it was – I was not informed prior to Mr. Triplett hitting the stand and being cross-examined. I was not told about that meeting. I was not told anything until he was being cross-examined.
>
> [COURT]: Whatever. Call your next witness."

¶ 57    We agree with the State that defendant cannot establish the first element of his *Brady* claim where he cannot establish that the evidence of Raphael's recantation was favorable to defendant. In fact, Raphael's alleged recantation of his prior testimony was highly unfavorable to defendant in that it contradicted defendant's self-defense claim.

¶ 58    During oral arguments, defense counsel admitted that the facts presented here did not exactly meet the standards of a *Brady* violation, but nevertheless asked us to draw an analogy between a *Brady* violation and what happened here – the defense's surprise regarding Raphael's June 2018 interview. Defense counsel maintained that Raphael was a key witness and that if the June 2018 interview had been timely disclosed, the defense could have investigated and interviewed the individuals present at the meeting and developed evidence that would have rebutted the purported recantation. However, Raphael was a defense witness, and Illinois Supreme Court Rule 412(a) (eff. Mar. 1, 2001), which outlines the discovery obligations of the State, does not obligate the State to disclose the fact that it conducted an interview with a defense witness.

¶ 59    Defendant also argues that Illinois Supreme Court Rule 214(c) (eff. July 1, 2018), required the State to show a good-faith effort to provide any material information, or information

17

that could impact defendant's sentencing. Rule 214 governs the discovery obligations regarding "documents, objects, and tangible things." The record shows that no notes were taken during the interview in question. Accordingly, there were no documents to produce to defense counsel in connection with the June 2018 interview. See *People v. Williams*, 262 Ill. App. 3d 808, 823 (1994) (the State is required to disclose a witness's oral statements only when they are reduced to writing and are in the witness's own words or substantially verbatim).

¶ 60     Moreover, the evidence in question is not such that it created a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. See *Walls*, 323 Ill. App. 3d at 445 ("The appropriate inquiry is not whether the evidence might have helped the defense, but whether it is reasonably likely that it would have affected the outcome of the case."). We find that the outcome of the trial would not have been different had defense counsel had this information prior to trial, as Raphael denied his alleged recantation at trial. Accordingly, the trial court did not abuse its discretion in overruling defense counsel's objection to the introduction of evidence of the June 2018 interview.

¶ 61                          B. Sufficiency of the Evidence

¶ 62     Defendant's second claim on appeal is that the State failed to prove him guilty beyond a reasonable doubt of second-degree murder where the testimony of the two eyewitnesses were "inconsistent, inaccurate, and contained discrepancies." The State maintains that it proved defendant guilty of second-degree murder beyond a reasonable doubt.

¶ 63     When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). Circumstantial evidence that meets this

18

standard is sufficient to sustain a criminal conviction. *Id.* at 281. "Under this standard of review, it is the responsibility of the trier of fact to 'fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *People v. Howery*, 178 Ill. 2d 1, 38 (1997) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not the function of the reviewing court to retry the defendant. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). Therefore, a reviewing court will not substitute its judgment for the trier of fact on issues involving the weight of the evidence or the credibility of witnesses. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 64 Defendant argues that Tequila and Christine Triplett were not credible because their testimony contained inconsistencies, discrepancies, and inaccuracies. For Tequila's testimony, defendant contends that "it doesn't make sense that [Tequila] would go to warn her nephew, whom she loved, about what she believed to be an imminent threat, but then stop short of doing so." It is defendant's position that if Tequila saw defendant with his hand on his pocket, and it concerned her, then when she went to speak to the victim, she would have told him defendant had a gun, not just that defendant was "on something." He also takes issue with the fact that Tequila testified that she was in shock after the shooting "yet was completely lucid enough to know everything that happened around [the victim's] body. And finally, defendant argues that while Tequila was certain that defendant was the shooter, "so much time had elapsed between her observation and her statements that her testimony is unreliable."

¶ 65 These alleged issues with Tequila's statement and her testimony are exactly the type of issues to be resolved by the trier of fact. It is the function of the trier of fact to assess the

credibility of the witnesses and to resolve discrepancies and inconsistencies in the evidence. *Evans*, 209 Ill. 2d at 211. The trial court, as the trier of fact, was in a much better position than we are to determine Tequila's credibility and the weight to be accorded her testimony. See *People v. Tenney*, 205 Ill. 2d 411, 428-29 (2002). To the extent that defendant takes issue with Tequila's identification of defendant as the shooter, we note that the shooter's identity is not at issue in this case. Defendant admitted on the witness stand that he shot the victim, but claimed it was in self-defense.

¶ 66    Defendant claims that Christine Triplett's testimony was "equally unreliable" because she did not witness the shooting and her vision was poor. While she testified that the victim had a beer in his hand, defendant contends that the "shiny metal object" she saw was likely a gun. Defendant argues that "a more reasonable inference" would be that the object was a gun and not a beer can, however, we note again that the trial court is in the best position to assess the credibility of the witnesses and to resolve any discrepancies and inconsistencies in the evidence. *Evans*, 209 Ill. 2d at 211. Defendant also calls into question Christine's identification of defendant because she needed glasses to see, but as stated above, the identification of the shooter was not at issue in this case.

¶ 67    Finally, defendant contends that "the trial court failed to reasonably take into account, for purposes of witness credibility," the "relationship between each of these witnesses and the lengths they would go to protect each other." Defendant argues that Tequila and Christine, as Raphael's mother and grandmother, would "do everything they could to prevent another relative's life being negatively affected by this shooting." He concludes that "they manufactured a reason [Raphael] could not have participated in the shooting in any way," and that Raphael "denied any problems with his bladder that day." We reiterate that when considering a challenge

to the sufficiency of the evidence of a defendant's guilt, it is not the function of this court to retry the defendant. *Evans*, 209 Ill. 2d at 209. Here, the trial court heard the evidence and found Christine and Tequila to be more credible witnesses than the witnesses for the defense. We will not substitute our judgment for that of the trial court on questions involving the weight of the evidence or credibility of the witnesses. *Siguenza-Brito*, 235 Ill. 2d at 224-25. Accordingly, we find that the State proved defendant guilty of second-degree murder beyond a reasonable doubt.

¶ 68                                    C. Sentencing

¶ 69    Defendant's final argument is that the trial court failed to properly consider all of the evidence in mitigation when sentencing him to the full extended term of 30 years. As an initial matter, defendant states that this issue has been forfeited on appeal because defense counsel failed to object at sentencing and failed to raise the issue in a posttrial motion and asks us to review it under the plain error doctrine. However, at the conclusion of the sentencing hearing the following colloquy took place:

> "[THE COURT]: I'm guessing you want to file a motion to reconsider the
>
> sentence.
>
> [DEFENSE COUNSEL]: Without a doubt.
>
> [THE COURT]: Motion defendant to reconsider the sentence is timely filed.
>
> I'll consider your oral motion as to that. And I just explained my sentence,
>
> so that will be respectfully denied."

¶ 70    We note that in order to preserve a sentencing error for review, both a contemporaneous objection during the sentencing hearing and a written postsentencing motion raising the issue are required. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Here, defendant did not file a written postsentencing motion, but instead, made an oral motion to reconsider the sentence. However,

because the State did not object to the oral motion, the requirement to file a written motion is waived, and we may address defendant's sentencing issue. *People v. Davis*, 365 Ill. App. 3d 725, 731 (2005).

¶ 71    The trial court has broad discretionary powers in imposing a sentence and its sentencing decisions are entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). "A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "The trial judge has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Stacey*, 193 Ill. 2d at 209.

¶ 72    Absent an abuse of discretion by the trial court, the sentence may not be altered on review. *People v. Streit*, 142 Ill. 2d 13, 19 (1991). A sentence will be deemed an abuse of discretion where the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. While Illinois Supreme Court Rule 615(b)(4) grants a reviewing court the power to reduce a sentence, that power should be exercised "cautiously and sparingly." *People v. O'Neal*, 125 Ill. 2d 291, 300 (1988). A reviewing court must not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently. *People v. Pittman*, 923 Ill. 2d 169, 178 (1982).

¶ 73    Upon reviewing the record, we find that the trial court did not abuse its discretion in sentencing defendant to 30 years in prison. Defendant was charged with first-degree murder, and the trial court stated during sentencing that "first-degree murder with a gun [] would have

involved the life sentence without the possibility of parole." However, the trial court convicted defendant of second-degree murder, a Class 1 offense, with a sentencing range of 4 to 20 years. 730 ILCS 5/5-4.5-30(a) (West 2016). Based upon defendant's prior criminal history, defendant was considered a Class X offender, and the sentencing range was increased to 15 to 30 years in prison. Because defendant was sentenced to 30 years in prison, which is within the prescribed statutory range, it is presumed to be proper. See *People v. Starnes*, 374 Ill. App. 3d 132, 143 (2007) (if sentence imposed is within statutory range, it will not be deemed excessive unless greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense).

¶ 74　Illinois requires a trial court to impose a sentence that achieves a balance between the seriousness of the offense and the defendant's rehabilitative potential. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

> "To find the proper balance, the trial court must consider a number of aggravating and mitigating factors including: 'the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education.'" *Id.* (quoting *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992)).

¶ 75　Here, the record shows that the trial court considered the appropriate factors in aggravation and in mitigation. At the sentencing hearing, the trial judge stated:

> "This happened on July 5, 2016. The evidence at the trial was very disputed. I did not believe that there ever was another gun that [the victim] had. I thought that was false testimony that the Court received on that topic.

That being said, I did understand that there was something going on, criticism about the manner in which somebody was driving, the person – [the victim] being intoxicated and acted in a way where he came out angry about that. [Defendant] did what he did with a gun that he never should have had, especially as an already-convicted felon. And he knew that. And he shot and executed this man on the street as he did.

And with all of that, this court tried very hard to listen carefully to all of the facts and circumstances and gave as much benefit of the doubt as the law and the facts would allow me to do and he was found guilty of second-degree murder instead of first-degree murder with a gun that would have involved the life sentence without the possibility of parole.

Now I have to consider the range for what to do with [defendant] for the offense of second-degree murder. And I know the facts are what they are on this case, but I also know about him and the things I heard from his mom, Cathy Broom. ***.

But the fact is that there's something going on with [defendant] that's way above whatever his mom has provided for him. He's got a dark side to him. The facts in this case are particularly egregious. If you add on the fact that he's already been convicted of armed robbery having been sentenced as an adult on a previous matter – I won't even consider the fact that right after this homicide occurred he was arrested later with a different gun altogether later. I said I won't consider that because he's not – that case is still in a trial posture where he's – or where it hasn't even been tried yet. He's presumed to be innocent, so I won't consider that

24

against him, but I do see problems with [defendant]. I have an obligation to be fair to him and I believe I was innately fair to him during the course of this trial. Sentencing, I knew I would be fair to him, but I also must be fair to the public.

I think he's a danger. I think he's a threat to the community. He's already killed. I think his proclivity to use handguns in the manner described are a grave concern. I find he's eligible for an extended term to the extent I can, so the sentence will be 30 years in the penitentiary."

¶ 76    There is simply no indication here that the trial court "did not properly consider the mitigating factors." The trial court specifically stated that it had considered the testimony of defendant's mother but noted that it also had to be fair to the public. "A defendant's rehabilitative potential *** is not entitled to greater weight than the seriousness of the offense." *People v. Coleman*, 166 Il. 2d 247, 261 (1995). Additionally, the trial court "has no obligation to recite and assign value to each factor presented at a sentencing hearing. Rather, it is presumed that the trial court properly considered all mitigating factors and rehabilitative potential before it; and the burden is on defendant to affirmatively show the contrary." *People v. Brazziel*, 406 Ill. App. 3d 412, 434 (2010).

¶ 77    In the case at bar, defendant shot the unarmed victim in the face multiple times at point blank range. He did not have a FOID card and could not legally possess a firearm. He had previously been convicted of armed robbery. We reiterate that "[t]he most important sentencing factor is the seriousness of the offense, and the court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense." *People v. Contrusi*, 2019 IL App (1st) 162894, ¶ 24. Additionally, any attempt by defendant to argue that this was mutual combat or that the beer can that Christine saw was actually a gun, is irrelevant here because "the

mitigating circumstances of mutual combat and self-defense already factored into the [trial court's] verdict of the lesser offense of second-degree murder." *People v. Scott*, 2015 IL App (1st) 131503, ¶ 53.

¶ 78    To the extent that defendant attempts to rely on *Miller v. Alabama*, 567 U.S. 460 (2012), in support of his proposition that the trial court abused its discretion in sentencing defendant, we are unpersuaded. The Supreme Court in *Miller* concluded that the eighth amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at 479. Consequently, before imposing a mandatory life sentence, "mitigating circumstances" such as "an offender's youth and attendant characteristics" have to be considered. *Id.* at 483, 489. The Illinois Supreme Court subsequently ruled that *Miller* also applies to discretionary life sentences. *People v. Holman*, 2017 IL 120655, ¶ 40. It has also concluded that *Miller* applies to *de facto* life sentence, which has been determined to be any sentence exceeding 40 years for a juvenile offender. *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42. Here, defendant was 22 years old when he committed this crime and therefore not a juvenile. Even if we were to find that *Miller* and its progeny applied to him at age 22, he did not receive a *de facto* life sentence, as his 30-year prison term did not exceed 40 years. Accordingly, we find that the trial court did not abuse its discretion in sentencing defendant to 30 years in prison.

¶ 79                                III. CONCLUSION

¶ 80    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 81    Affirmed.

¶ 82    PRESIDING JUSTICE MIKVA, concurring in part and dissenting in part:

¶ 83    I agree with the majority that Mr. Parker has presented no ground for reversal based on a *Brady* violation or the insufficiency of the evidence to support his conviction. But I would

reverse and remand to allow the trial court to reconsider Mr. Parker's 30-year sentence—the longest possible extended-term sentence for the crime for which Mr. Parker was found guilty. It is apparent to me from the record that, despite the overall care the court took to be fair to Mr. Parker, at sentencing the court not only failed to consider significant mitigating factors but improperly considered other factors as aggravating. In my view, the resulting sentence fails to achieve the constitutionally required "balance between the seriousness of the offense and the defendant's rehabilitative potential." *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 84    If the trial judge had not determined that an extended-term sentence was appropriate in this case, the longest sentence Mr. Parker could have received was 20 years. 730 ILCS 5/5-4.5-30 (a) (West 2016). Once the court determined that Mr. Parker was eligible for an extended-term sentence, however, the maximum sentence became 30 years. *Id.* This maximum possible sentence was the sentence Mr. Parker received.

¶ 85    Mr. Parker argues that the trial court failed to consider the relevant mitigating evidence. I agree. The pre-sentence investigative report detailed his past trauma, including the loss of his father when he was 10 and the death of his older brother while he was incarcerated awaiting trial on this crime. This was same brother who Mr. Parker testified he had been trying to protect when he killed Mr. McCoy. The investigative report confirmed that Mr. Parker finished high school, had taken some college courses, had earned a certificate for training in computers, was not a gang member, and had maintained steady employment and a relationship with his son. The sentencing hearing included compelling testimony from Cathy Broom, Mr. Parker's mother, who ended by noting that Mr. Parker had "lots of potential, and sadly, in this situation, [he had] been the product of the environment." The sentencing hearing also included Mr. Parker's own

statement in allocution, in which he expressed remorse for having taken a life and made specific commitments regarding his future.

¶ 86    The court's comments at sentencing suggest that it believed it had already given Mr. Parker a significant break by finding him guilty of second degree, rather than first degree murder, and may have been disinclined to grant him further leniency by seriously considering the mitigating evidence Mr. Parker presented. The court introduced its sentencing ruling by specifically noting that "[Mr. Parker] was found guilty of second-degree murder instead of first-degree murder with a gun that would have involved the life sentence without the possibility of parole." While the State had charged Mr. Parker with both offenses, the evidence fully supported the trial court's decision that Mr. Parker fired his gun out of a genuine, if unreasonable, belief that he and his brother were in danger of being killed. Mr. Parker's father had already been the victim of gun violence and shortly after this incident his brother was also shot and killed. Mr. Parker testified that he had been shot at, personally, multiple times. All witnesses agreed that the victim in this case had acted in an aggressive manner and had been holding something in his hand. The trial court properly and carefully considered this evidence to determine that Mr. Parker had acted in response to fear, even if the court did not ultimately believe that the victim had possessed a gun. But careful consideration of the evidence in light of the State's burden of proof is what due process requires. The court's finding that Mr. Parker was guilty of second degree murder was not an act of the court's benevolence that negated the need for it to fully consider the mitigating evidence presented at sentencing.

¶ 87    The court's apparent failure to consider that evidence seems also to have been compounded by its improper consideration of facts that the court viewed as justifying an extreme sentence. We have recognized, for example, that it is improper for a trial judge to consider as an

aggravating factor the fact that he believed a witness had testified falsely on the defendant's behalf at trial. *People v. McAfee*, 332 Ill. App. 3d 1091, 1097 (2002). Yet during its relatively brief comments at sentencing, the trial court also took pains to note that it did not believe the defense witnesses who testified at trial that the victim had a gun. Such comments are further evidence that the sentencing judge, though well-intentioned, failed to maintain an appropriate boundary between the factfinding and sentencing phases of Mr. Parker's trial.

¶ 88     Also, although the trial court in this case recognized that it is improper for a sentencing court to rely on pending charges as an aggravating factor (*People v. Minter*, 2015 IL App (1st) 120958, ¶ 148), the court went on to cite Mr. Parker's "proclivity" for using handguns as evidence that he had a "dark side," immediately after he noted that Mr. Parker had been arrested on a different gun charge but not yet tried. These comments suggest that the court, though cognizant of the fact that it could not consider the pending gun charge as an aggravating factor, nevertheless let its knowledge of that charge lead to a conclusion that Mr. Parker had a propensity to use handguns for criminal purposes.

¶ 89     The maximum sentence imposed and the court's statements during the sentencing hearing convince me that the trial court did not consider the significant mitigating factors during sentencing and considered irrelevant or improper aggravating factors. I would remand this case for a new sentencing hearing.