2024 IL App (1st) 231072-U

Order filed: December 5, 2024

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-1072

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 18653 |
| | ) | |
| RONDALE PARKER, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lyle and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The summary dismissal of defendant's postconviction petition at the first stage is reversed where one of his claims was not frivolous or patently without merit.

¶ 2    Following a bench trial, defendant-appellant, Rondale Parker, was found guilty of second degree murder, a Class 1 offense, (720 ILCS 5/9-2(a), (d) (West 2016)), and sentenced to an extended term of 30 years' imprisonment based on the aggravation and mitigation evidence, including his criminal history, pursuant to 730 ILCS 5/5-8-2 (West 2018). On direct appeal, this court affirmed. See *People v. Parker*, 2021 IL App (1st) 190823-U. Defendant subsequently filed

a *pro se* postconviction petition, pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), alleging ineffectiveness of trial and appellate counsel. The postconviction court summarily dismissed defendant's petition at the first stage of proceedings. On appeal, defendant contends that the postconviction court erred in summarily dismissing his petition as the allegations of ineffective assistance have an arguable basis in law and fact. For the following reasons, we reverse and remand for second-stage proceedings.

¶ 3     In 2016, defendant, then 22 years old, was charged with six counts of first degree murder, which arose from the events of the July 5, 2016 shooting death of Laron McCoy (the victim).

¶ 4     At trial, Tequila Triplett, the victim's aunt, testified that she has three sons, Charles Bolden, Raphael Triplett, and Sergio Triplett. On July 5, 2016, Tequila lived at 8136 Burnham, in Chicago (Tequila's house), across the street from her mother, Christine Triplett, who lived at 8139 South Burnham (Christine's house). At about 1:00 p.m., Tequila was on Christine's porch talking to her, when she saw the victim "pull[] up" and exit his vehicle. The victim asked for Bolden, his cousin, who he would sometimes drive to work. Tequila told the victim that Bolden had left to get cigarettes at "the candy store," located in someone's home a block away on Muskegon Street. The victim drove off and left for a short time. When the victim came back, he told Tequila that he had not found Bolden, asked her to have Bolden call him, and then entered Tequila's house.

¶ 5     Thereafter, Tequila saw Scott Coleman, the brother of defendant, walking through a vacant lot next to Christine's house (the lot). Tequila had known Coleman and defendant for about 15 years; they were about the same ages as her sons. Coleman told Tequila that the victim had swerved by his car. He stood in front of Tequila's house and then left.

¶ 6     About five minutes later, Coleman walked back through the lot with defendant and stood "directly in front" of Tequila's house. Tequila walked across the street to her house, went inside,

and talked to the victim. The victim looked out the window and saw Coleman and defendant and asked Tequila what "they was on." Tequila told him, "[T]hey said something about you was swerving by their car." The victim exited Tequlia's house and walked across the street and approached Coleman and defendant, who were standing in front of Christine's house. From the window, Tequila saw the three men talking, but when "they started moving hands *** like it was getting serious," Tequila walked out of the house and into the middle of the street. She heard the victim say that he did not have to explain himself "how he drive," and then defendant "start shooting him in his face." Coleman and defendant ran away. Tequila did not see any weapons in the victim's hands and did not hear the victim threaten either Coleman or defendant. Tequila remained with the victim until the police arrived. She did not see anyone else.

¶ 7     During the shooting, Raphael was inside of Christine's house, asleep on the floor. She explained that he had a bladder problem and was "laying in piss."

¶ 8     On the day of the shooting, Tequila went to the hospital stayed a few days. Shortly after being released, she spoke to detectives about what she witnessed on the date in question. She identified photos of both Coleman and defendant.

¶ 9     On cross-examination, Tequila testified that Raphael was lying in the living room, about ten feet from the front door, which was open. Tequila never knew the victim to own a handgun and had never seen a handgun around his waist. On the day in question, Coleman and defendant stood directly in front of Christine's house. Defendant had his hand on his pocket, which concerned Tequila because she thought he had a weapon. When she went across the street to her house, the victim was inside talking to a "couple of females." After the victim looked out the window and said, "What are these guys on?", Tequila answered, "[I]t looks like they on something." Tequila

testified that she meant they "were up to something." She did not tell the victim that defendant had something in his pocket.

¶ 10    On redirect examination, Tequlia testified that Raphael was in custody on a pending felony charge, and that she was not given any promises in his case for her testimony.

¶ 11    Christine Triplett testified that the victim was like a grandson to her because she knew him from her grandsons. On the day of the shooting, she was sitting on her porch with Tequila. The victim arrived at 1:00 p.m., and asked for Bolden so he could give him a ride to work. The victim went to look for him but then came right back. Christine thought he left again; she did not see his car parked down the street.

¶ 12    Shortly thereafter, Coleman walked through the lot and asked what the victim "was on," and left. Coleman came back a short while later with defendant. The victim left Tequila's house and started talking to Coleman and defendant outside of the gate in front of her house. She heard the victim say something similar to, "I drive like that anyway. I ain't got to explain nothing to you." The victim then turned his shoulder like he was going to walk away and defendant started shooting him. The victim had a beer can in his left hand that he was trying to hide from Christine, because she had never seen him drink alcohol. The victim did not have anything in his other hand.

¶ 13    Christine went inside her house and called the police. When they arrived, she told the police that defendant shot the victim. She identified defendant and Coleman in a photo array.

¶ 14    Christine testified that Raphael was in custody on a pending felony charge and that she was not given any promises for her testimony. During the shooting, Raphael was in the house "laying on the floor" in "a puddle of pee pee because *** his bladder was messed up." She never saw Raphael exit her house.

¶ 15    On cross-examination, Christine testified that when Coleman and defendant stood in front of her gate, Tequila went across the street. A short time later, the victim came outside. The victim stated that he "wasn't on nothing," and his right hand was up at face level. When she heard the first shot, she ran inside but then came right back out. The victim eventually fell to the ground.

¶ 16    The audio recording of Christine's phone call to 911 was played; at the beginning she can be heard calling for Raphael. Christine testified that Raphael never got up.

¶ 17    Thereafter, the following stipulations were made. An evidence technician would testify that he recovered four fired cartridge cases. Another evidence technician would testify that she recovered two bullet fragments that were recovered from the victim during the autopsy. A medical examiner would testify that she conducted the autopsy of the victim, who suffered four gunshot wounds. The victim suffered one gunshot wound on the left side of his face, near his jaw. This was a close-range gunshot entrance with stippling present and it exited the right side of the victim's neck. The victim suffered a gunshot wound on the left side of his head that travelled downward toward his right jaw, lacerating the tongue on the right side. There was no evidence that it was a close-range gunshot wound. The victim suffered a gunshot wound to his right cheek, which travelled through his brain. This was a close-range gunshot entrance wound, with the presence of stippling. The victim also had a gunshot wound on his right, anterior, upper thigh that exited the posterior inner thigh. There was no evidence that this was a close-range firing. A Chicago Police Officer would testify that he recovered a firearm during a traffic stop, and an expert in the field of forensic science would testify that this gun fired the bullets recovered from the victim's body and the four fired cartridge casings from the scene. Lastly, a toxicology report was completed and the victim's blood alcohol content was .076.

¶ 18     For the defense, Raphael Triplett testified that, on the day of the shooting, he was living at Tequila's house. He was not suffering from an illness and was not laying on the floor of Christine's house in his own urine. Rather, he was outside and saw the victim drive up, enter Tequlia's house, and exit five minutes later. Defendant and Coleman were walking up the block and stopped outside of Christine's house. The victim, who was fidgeting with his waistline, stormed passed him and stated, "[t]here goes [defendant]." The victim approached defendant and Coleman. During a discussion, defendant tried to walk away, but the victim "upped the gun." Defendant then pulled out his own gun and "turned around and shot [the victim]." Defendant and Coleman ran away. Prior to the victim pulling out a gun, he had not seen defendant or Coleman with a gun. After the victim fell to the ground, Raphael picked up the victim's gun and threw it in a garbage can in the alley behind Christine's house. He never told the police what he saw.

¶ 19     On cross-examination, Raphael testified that he was in custody for a pending aggravated vehicular hijacking with a firearm. On January 17, 2017, prior to his arrest, Raphael gave a signed statement about the shooting to a defense investigator. Later, in June 2018, he met with an assistant State's Attorney (ASA), a defense attorney, and two detectives. When asked if it was true that at the June 2018 meeting he said his prior written statement was incorrect, Raphael responded, "No, sir." The State then asked Raphael if it was true that he denied removing a firearm from near the victim at the June 2018 meeting, to which Raphael responded, "No, sir."

¶ 20     Raphael testified that when the victim was shot, he was the only one outside. He picked up the victim's gun from the ground because of "instincts." Raphael never told anyone that he took the gun. Raphael testified that in 2016, he had a "misunderstanding" with Coleman and defendant about money for marijuana.

¶ 21    On redirect examination, Raphael stated that he saw the victim point a gun at defendant and cock his gun before defendant shot the victim.

¶ 22    On recross-examination, Raphael testified that he did not know why, in the January 2017 statement, he did not say that the victim pointed a gun at defendant other than there was "[s]o much going on."

¶ 23    The parties stipulated that if called to testify, LeRoy McBride, would testify that he did not witness the shooting, but, on the day of the shooting, defendant and Coleman had appointments to have their hair cut by him.

¶ 24    Darien Garrett testified that he knew defendant from the neighborhood but did not know the victim. On the day of the shooting, he was walking through some yards and saw Raphael. The victim was standing on a porch across the street talking to a "young lady" named Gianna. The victim stated, "If you want it with my cousin, you want it with me," referring to Raphael. Garrett saw the victim jog slowly across the street "clutching something at his waistband." When he moved his hand to pull up his pants, Garret saw "a gun shaped item." Garrett went to the lot and heard arguing. Shortly after that, he heard gunshots; he did not see the shooting. A day or two later, Garrett saw Raphael, who told him that he "removed a gun from the scene, a watch and some weed."

¶ 25    On cross-examination, Garrett testified that there was a "rumor" that the victim was looking for defendant due to a disagreement between Raphael and defendant and Coleman. He believed that Raphael stole weed from Coleman.

¶ 26    Deshawn Lucas testified that he grew up with defendant in the neighborhood and knew Coleman and the victim. He had heard that the victim was looking for defendant and Coleman due

to an argument about marijuana that Raphael had taken "or something." Lucas pled guilty to armed robbery in 2009 and served five years of his ten-year sentence.

¶ 27    On the day of the shooting, Lucas was sitting on the porch next to Tequila's house, when he saw defendant and Coleman walking up the block. Lucas asked where they were going, and they responded that they were going to see the neighborhood barber. He saw the victim leave Tequila's house with a gun in his hand; "it was, like, a metal, like bright, like, chrome kind of." When he saw the gun, Lucas "[s]lided [*sic*] off the porch into the gangway." He did not see defendant with a gun. As he turned away, he heard a shot, got low, and waited for a minute. When he came out, he saw the victim on the ground with a gun. Raphael and Bolden ran out of Christine's house. Raphael grabbed the gun off the ground, Bolden searched the victim, and then they ran away. Lucas did not call the police and did not tell them what he observed.

¶ 28    On cross-examination, Lucas testified that he did not see the shooting.

¶ 29    The parties stipulated that the victim had been convicted of aggravated robbery for an incident that happened in 2011 and was given two years of probation.

¶ 30    Defendant testified that Coleman was "found shot dead in his car last year, like, eight months after this incident." The car was located about two blocks from where the shooting occurred.

¶ 31    When defendant was 15 years old, he pleaded guilty to armed robbery and was sentenced to seven years' imprisonment. He was with two older men who "used [him] as a lookout."

¶ 32    Defendant grew up with Raphael. In the days and weeks before the shooting, "several females," including Shameka Cooper and Jaquita Foots, had been telling him that the victim was "looking for" him because the victim "figured me and [Bolden] got into a fight, like, two months prior." Raphael also stole cannabis from Coleman.

¶ 33    On the day of the shooting, defendant met up with Coleman at approximately 8 a.m. at 81st and Muskegon. They were waiting for their barber but he was not available that early in the morning. Later that day, they received a call from their barber and they walked to 83rd and Burnham. Defendant had a gun in his pocket. He was not legally allowed to carry a firearm and did not have a concealed carry permit or a Firearm Owners Identification (FOID) card.

¶ 34    As they were walking, defendant saw Lucas and told him they were going to get haircuts. There were other people out on porches. The victim left Tequila's house, quickly approached him and Coleman, and "grabbed his gun out of his pocket and put it on his waist." The gun, which defendant had previously seen the victim with, was "smoke grey with a brown handle." The victim stated, "You all jumped on my cousin" and then "pulled out the gun." Defendant dropped his cell phone and Coleman, who had also been talking on his phone, told the person on the phone, "He just upped the gun, he just pulled a gun on us." The victim, a foot from defendant and Coleman, pointed a gun at their faces and was waving it back and forth. Defendant was scared and thought the victim was drunk and was going to shoot him. Defendant told the victim they would leave and as defendant turned, he put his hands in his pocket. When he turned back toward the victim, the victim was looking toward Raphael on the other sidewalk, so defendant turned and shot the victim four or five times. Defendant and Coleman ran. Defendant was arrested three or four months later.

¶ 35    On cross-examination, defendant testified that Foots was his friend and Cooper was her sister. Foots had spoken with investigators and defendant had asked Cooper to give a statement. When he and Coleman were walking down Burnham, the victim stopped defendant and Coleman in front of Christine's house. Defendant did not see Christine on the porch and did not see Tequlia. Raphael was in the doorway of Tequila's house. The victim, as he was crossing the street, began to pull out his gun and held it by his waist. He then pulled it out when he was right in front of

defendant. Coleman was behind and to the side of defendant. The victim had his hand outstretched. Defendant had a chance to pull out his gun, when the victim looked towards Tequila's house. Defendant "wasn't looking where [he] was shooting." Defendant explained: "I just pulled out and I kind of blocked because his gun was right in front of my face. I kind of put my arm up and I shot as I was ducking at the same time. *** And I shot him as he was falling."

¶ 36    In rebuttal for the State, Sergeant Donovan Jackson testified that he was assigned to investigate the shooting. On June 27, 2018, he was present for a conversation with Raphael. His partner, an ASA, and Raphael's attorney were also present. At that time, Raphael, who was in custody, indicated that he had not actually witnessed the shooting, never saw a gun, and never took a gun. This conversation was not memorialized.

¶ 37    Carnell Smith also testified in rebuttal for the State. He knew defendant, Coleman, and Raphael from the neighborhood. On February 25, 2018, Smith met with an investigator for the defense and gave a handwritten statement. Two days after the shooting, Raphael came over to his house and Smith asked him why he just sat there while the victim got shot. Raphael answered that he did not see the shooting as he was inside of the house when he heard shots. Raphael went outside, saw the victim and a gun on the ground, and took the gun. He did not tell Smith what he did with it.

¶ 38    Following the close of evidence, the trial court stated in part:

"I listened carefully to all the witnesses in this case. I find it wholly inexplicable that you have witnesses like Tequila and Christine *** that would tell me under oath that Raphael *** was laying in his urine because he's got a bladder problem ***.

He is laying on the floor in his urine, that they would just make that up out of nowhere. That there is no way in this world that that could happen. I believe that they

-10-

[were] correct about where he was and why he was there. I find his testimony and this business about [the victim] coming out there with a gun to be and the fact that Raphael would take a gun used by [the victim] and run away and throw it in the garbage, I found it to be not true or accurate. I do not believe that for a second.

I don't believe that [the victim] had a gun that day at all. I do know that for whatever reason [defendant] was excited and let that be known about the way he had been driving, he, being [the victim], had been driving, there was prior history, prior anosmous [*sic*] and the anosmous [*sic*] extended about different people and on different events.

\*\*\*

The argument didn't happen—the shooting didn't happen in the total vacuum. There were things that led up to it. There was excitement. [The victim] was drunk. [The victim] did have a history of violence but he wasn't armed that day.

So what happens? [Defendant] shoots him in the face multiple times. The only person that shot that day was the defendant. He shot an unarmed man, although he shot an unharmed [*sic*] man that had came towards him apparently or perhaps with some bad intentions.

I cannot say that this is in any way justified. This is a criminal act. It is murder. There were circumstances that led up to it. It wasn't something that was planned beforehand. He went there for a haircut with a gun in his pocket.

He let things from the past and from the present, minor things blow up and things did blow up. He may have thought that he needed—that he was being provoked and may have thought somehow falsely that he needed to defense himself which was really stretching it.

-11-

The bottom line, he is guilty of murder in the second degree. That will be the finding. Bond revoked. Presentence investigation will be ordered."

¶ 39     Th trial court ultimately found that defendant was subject to an extended-term sentence, and sentenced him to 30 years' imprisonment. See 730 ILCS 5/5-8-2 (West 2018). Defendant filed a direct appeal, asserting that (1) the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) his conviction for second degree murder was against the manifest weight of the evidence; and (3) the trial court failed to give appropriate weight to mitigating circumstances before sentencing him. *Parker*, 2021 IL App (1st) 190823-U. We affirmed defendant's conviction and sentence on appeal. *Id.*

¶ 40     On October 18, 2022, defendant filed a 38-page *pro se* postconviction petition (petition), attached to which were 26 pages of exhibits. Therein, defendant asserted numerous claims of ineffectiveness of trial and appellate counsel.

¶ 41     As relevant to our resolution of this appeal, among the claims of ineffective assistance of trial counsel included in the petition was an assertion that defendant's trial counsel was ineffective for failing to interview and call various witnesses. These witnesses include several persons who provided written statements to a private investigator prior to trial. Defendant attached to the petition signed statements by Shameka Cooper, Jaquita Foots, Garrick McKinney, and Damian Pedroso in support of this claim.

¶ 42     Also attached to the petition were affidavits executed by defendant averring that there were additional witnesses including Bolden, "Krystal and Gianna," "Micole," Mikael Robinson, and Tamara McCallister that would testify as to his self-defense claim. Of particular note, in the petition and in one of his affidavits, defendant averred that Bolden was not subpoenaed for trial but was present at the courthouse and defendant repeatedly asked counsel to call him. However,

defendant's trial counsel previously represented Bolden, who was both the son of Tequilla and grandson of Christina (prosecution witnesses), and the cousin of the victim. The petition thus asserted that trial counsel improperly failed to investigate and interview Bolden, or call Bolden as a witness at trial, due to a conflict of interest resulting from trial counsel's prior representation of Bolden. Defendant contended that Bolden's testimony was important to his defense, as other witnesses testified that Bolden removed items from the victim after the shooting and he could have corroborated defendant's testimony that defendant, the victim and Bolden had a prior fight that was the motivation for the confrontation on the day of the shooting. Defendant only learned of his trial counsel's prior representation of Bolden after his trial concluded, at which time he also learned that Bolden and his trial counsel had a conversation at the courthouse during defendant's trial. Defendant was unable to secure an affidavit from his trial counsel.

¶ 43    Among the claims of ineffective assistance of appellate counsel included in the petition was an assertion that defendant's appellate counsel was ineffective based on the failure to challenge the validity of his sentence. Defendant specifically argued his sentence was improperly extended based on an adult conviction he received while still a juvenile.

¶ 44    The trial court summarily dismissed defendant's petition. Defendant's June 14, 2022, motion to file a late notice of appeal was granted by this court.

¶ 45    On appeal, defendant contends that his petition states the gist of three meritorious claims: (1) that his trial counsel was ineffective for failure to present numerous witnesses that would have supported his theory of self-defense; (2) his trial counsel improperly failed to investigate or present the testimony of Bolden, due to an improper conflict of interest arising from trial counsel's prior representation of Bolden; and (3) that his appellate counsel was ineffective for failure to raise the

issue that he was statutorily ineligible for an extended-term sentence. The State offers no response to defendant's second contention, which we find both persuasive and dispositive of this appeal.

¶ 46    The Act provides a procedural mechanism through which a defendant may assert that his conviction or sentence resulted from a substantial denial of his constitutional rights. 725 ILCS 5/122-1 (West 2022). The Act provides a three-stage process for adjudication of a postconviction petition. *People v. Applewhite*, 2020 IL App (1st) 142330-B, ¶ 15. At the first stage of a postconviction proceeding, the postconviction court must assess the petition, taking the allegations as true, and determine if it is frivolous or patently without merit such that it failed to state the gist of a meritorious constitutional claim. *Id.*; *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). A petition may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis in either fact or law. *People v. Tate*, 2012 IL 112214, ¶ 9 ("the threshold for survival [is] low"). A petition lacks an arguable basis in fact or law when it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. Fanciful factual allegations are those which are "fantastic or delusional" and an indisputably meritless legal theory is one that is "completely contradicted by the record." *Id.* at 16-17. Our review of a first-stage summary dismissal is *de novo*. *Tate*, 2012 IL 112214, ¶ 10.

¶ 47    A *pro se* petitioner is not required to allege facts supporting all elements of a constitutional claim. *People v Mars*, 2012 IL App (2d) 110695, ¶ 32. Because a *pro se* petitioner will likely be unaware of the precise legal basis for his claim, the threshold for survival is low, and a *pro se* petitioner need allege only enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act. *Hodges*, 234 Ill. 2d at 9. However, the petition must " 'clearly set forth the respects in which the petitioner's constitutional rights were violated.' " *Id.* (quoting 725 ILCS 5/122-2 (West 2006)).

¶ 48    "A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Yost*, 2021 IL 126187, ¶ 36. This "guarantee of conflict-free representation ensures that a defendant is provided assistance by an attorney whose allegiance to his client is not diluted by conflicting interests or inconsistent obligations." (Internal quotation marks omitted.) *Id*. "Essentially, the party asserting such a claim is arguing that a conflict rendered the attorney's performance substandard and that the substandard performance caused prejudice." (Internal quotation marks omitted.) *Id*.

¶ 49    Illinois recognizes two kinds of conflicts of interest—*per se* and actual. Id. ¶ 37. "A *per se* conflict of interest exists when specific facts about the defense attorney's status, by themselves, create a disabling conflict." *Id*. ¶ 39. Our supreme court has recognized a *per se* conflict of interest only in three specific circumstances: where defense counsel (1) "has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution;" (2) "contemporaneously represents a prosecution witness"; or (3) "was a former prosecutor who had been personally involved with the prosecution of [the] defendant." *People v. Fields*, 2012 IL 112438, ¶ 18.

¶ 50    Defendant does not argue on appeal that there was a *per se* conflict; he instead focuses on whether there was an actual conflict. While our supreme court has stated that "[a]n actual conflict generally, if not exclusively, involves joint or multiple representation" (*People v. Austin M*., 2012 IL 111194, ¶ 82), it has not expressly limited actual conflicts to those circumstances. "In actual conflict situations the accused need not prove prejudice in that the conflict contributed to the conviction, but it is necessary to establish that an actual conflict of interest adversely affected the lawyer's performance. [Citations.] In other words, the defendant must point to some specific defect

in his counsel's strategy, tactics, or decisionmaking attributable to the alleged conflict of interest." *People v. Austin M.*, 2012 IL 111194, ¶ 82.

¶ 51   Subject to exceptions not relevant here, Illinois Rule of Professional Conduct 1.7, provides, in relevant part, that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest" and that a concurrent conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Ill. R. Prof. Conduct, 1.7(a) (eff. Jan. 1, 2010). Taking as true the allegations in defendant's postconviction petition that his trial counsel refused to investigate Bolden or present his testimony at trial due to loyalties arising out of his prior representation of Bolden, we find defendant presented the gist of a claim that his trial counsel had an actual conflict based on his alleged prior representation of Bolden and that this conflict adversely affected the lawyer's prior representation of defendant in this matter.

¶ 52   Specifically, there was evidence presented at trial the Bolden had a significant role in the circumstances leading up to the dispute between defendant and the victim, and that Bolden removed items from the victim after the shooting at the same time Raphel retrieved a firearm that had been brandished by the victim. It is apparent how additional testimony from Bolden regarding these matters could possibly have assisted defendant's theory of self-defense at trial. Furthermore, the allegation that while investigating Bolden and presenting his testimony in this matter would be beneficial to defendant, trial counsel's representation of defendant in this regard could be "materially limited" by his prior representation of Bolden is not "fantastic or delusional." *Hodges*, 234 Ill. 2d at 16-17. This situation thus presents a potential violation of Illinois Rule of Professional

Conduct 1.7, and a potential violation of defendant's sixth amendment right to conflict-free representation. *Yost*, 2021 IL 126187, ¶ 36.

¶ 53    "Petitions filed *pro se* must be given a liberal construction and are to be viewed with a lenient eye, allowing borderline cases to proceed." *Mars*, 2012 IL App (2d) 110695, ¶ 32. At this early stage of postconviction proceedings, defendant need only show the gist of a claim that his trial counsel's performance resulted in deficient representation. Defendant's allegations that the failure to investigate Bolden and present his testimony at trial resulted from trial counsel's conflicted loyalties are sufficient to meet this low standard, and this claim was therefore improperly dismissed at the first stage.

¶ 54    Based upon our conclusion that it is at least arguable that defendant was denied effective assistance of counsel by trial counsel's failure to investigate or present the testimony of Bolden due to an actual conflict of interest, we need not reach defendant's remaining claims that he was denied effective assistance by trial and appellate counsel. See *People v. Rivera*, 198 Ill. 2d 364, 374 (2001) (the Act does not permit partial summary dismissals); *People v. Romero*, 2015 IL App (1st) 140205, ¶ 27 ("If a single claim in a multiple-claim postconviction petition survives the summary dismissal stage of proceedings under the *** Act, then the entire petition must be docketed for second-stage proceedings regardless of the merits of the remaining claims in the petition."). Although we remand this case for second stage proceedings under the Act, we express no opinion as to whether defendant's petition will ultimately support a substantial showing of a constitutional violation.

¶ 55    For the reasons stated above, we reverse the summary dismissal of defendant's *pro se* postconviction petition and remand for second stage proceedings.

¶ 56    Reversed and remanded.